**COMMONWEALTH of Pennsylvania,**
**Appellant**

**v.**

**Angel SANTIAGO, Appellee**

**No. 1191 EDA 2016**

Superior Court of Pennsylvania.

Submitted January 30, 2017
Filed April 20, 2017
Reargument Denied June 16, 2017

Hugh J. Burns, Jr., Assistant District Attorney, Philadelphia, for Commonwealth, appellant.

Pete Carr, Assistant District Attorney, Philadelphia, for Commonwealth, appellant.

Leonard Sosnov, Asst. Public Defender, Philadelphia, Karl Baker, Asst. Public Defender, Chief of Appeals, Philadelphia, for appellee.

BEFORE: BENDER, P.J.E., DUBOW, J., and SOLANO, J.

OPINION BY BENDER, P.J.E.:

The Commonwealth appeals from the order granting Appellee's, Angel Santiago, motion to suppress the in-court and out-of-court identification testimony of a police officer who, in violation of the Fourth Amendment to the United States Constitution and Article 1 § 8 of the Pennsylvania Constitution, conducted a warrantless search of Appellee's cell phone in order to ascertain his identity. The Commonwealth argues that a defendant's identity is never suppressible, and that, as a result, eyewitness identification testimony is, categorically, never suppressible. After careful review, we affirm in part, and reverse in part.

The suppression court summarized the relevant facts of this case as follows:

On July 31, 2014, at approximately 6:50 pm, Police Officer Paul Sanchez was on foot patrol with his partner in the area of the 3500 block of Randolph Street, Philadelphia. At that time, he observed a Mitsubishi Galante operating with a heavy front windshield tint in violation of the Pennsylvania Motor Vehicle Code. Unable to observe anyone inside the vehicle, he indicated for the vehicle to stop and pull over by waving it down. The driver complied, and lowered the driver's side window as Officer Sanchez approached the car on that same side. Officer Sanchez testified that he believed that no one else was out on the street at that time, and that the driver appeared to be nervous and avoided eye contact. Officer Sanchez then asked the driver for his license, registration, and insurance. The driver replied that he had no license.

Approximately one to two minutes elapsed during this entire exchange in which Officer Sanchez observed the driver's body and his mannerisms. In response to the driver's assertion that he did not have a license, Officer Sanchez instructed the driver to turn off the vehicle. The driver did not comply with this request. Instead, he began to reach into the center console area of the vehicle. Officer Sanchez reacted by extending his arm through the open automobile window and then grabbing the driver's arm to prevent him from retrieving anything from inside the center console area. As soon as Officer Sanchez secured the driver's arm, the driver accelerated on the gas pedal with half of the officer's body still inside the car, pulling away from the location of the stop. The driver ignored Officer Sanchez's repeated requests to pull over and stop the vehicle. As the driver continued to flee, Officer Sanchez released his grip on the driver, and launched himself off of the moving vehicle and onto the road. At some point while separating himself from the vehicle, the rear tire ran over Officer Sanchez's right foot. He later went to the hospital for an injury to his foot. During this encounter, Officer Sanchez was never able to ascertain the name or identity of the individual who was driving the aforementioned vehicle.

Moments after his initial encounter, Officer Sanchez and other officers returned to the location of the initial stop where Officer Sanchez's interaction had occurred. At that location, the police officers noticed a cellular phone (a "cell phone") on the ground of the highway. Officer Sanchez picked it up, and then he proactively opened the cell phone and accessed it without a search warrant to ascertain the identity of the individual who owned the phone.

Information for only two named individuals (hereinafter "contacts") was found in the cell phone. The first one was "Angel Santiago," and the second was labeled "My Babe." Officer Sanchez also testified that he, along with detectives, called the contact listed as "My Babe" with the contact's number as listed in the recovered cell phone, but no one answered. Neither of the names of these contacts was immediately displayed when the officer opened the cell phone. To the contrary, the officer affirmatively navigated through the phone and selected the necessary functions until the contacts appeared on the screen. In the instant case, Officer Sanchez and the detective further accessed the cell phone by selecting the features that directed them to the names and phone numbers of the two listed individuals contained in it.

On that same day, the assigned detective ran a search of the name Angel Santiago, recovered from the cell phone, through the National Crime Information Center (commonly referred to as "NCIC") criminal database, a system available to law enforcement agencies, containing the names of and information related to individuals who have been arrested. The detective specifically ran a search related to individuals named Angel Santiago living in Philadelphia. As a result of this NCIC search, a prison release photograph was obtained of this [Appellee]. The photograph was obtained as a result of the search of the name found in the cell phone. When the detective showed Officer Sanchez the photograph, he immediately recognized [Appellee] and identified [him] as the driver of the vehicle which had been stopped and who later assaulted him. Officer Sanchez was also interviewed by one of the detectives regarding the incident. Based on Officer Sanchez's positive photographic identification and the information he provided to the detective during his police interview, an arrest warrant was then issued for [Appellee], Angel Santiago.

Suppression Court Opinion ("SCO"), 7/18/16, at 1–3 (internal citations omitted).

In a criminal information filed on February 3, 2015, the Commonwealth charged Appellee with simple assault, aggravated assault, recklessly endangering another person, and fleeing or attempting to elude a police officer.[1] On December 29, 2015, Appellee filed an omnibus pre-trial motion seeking, *inter alia*, suppression of any in-court or out-of-court identification testimony, arguing that such testimony by Officer Sanchez was the fruit of the poisonous tree stemming from his unconstitutional search of Appellee's cell phone. A suppression hearing occurred on February 19, 2016, at which time Officer Sanchez was the sole witness to testify. On March 18, 2016, the suppression court granted Appellee's suppression motion. The Commonwealth filed a motion for reconsideration, which was denied on March 24, 2016.

The Commonwealth filed a timely notice of appeal on April 14, 2016, and preemptively filed a Pa.R.A.P. 1925(b) statement on the same day. In its Rule 1925(b) statement, following a brief recounting of the factual background of this case, the Commonwealth stated its claim as follows: "Did the lower court err in suppressing the officer's in-court and out-of-court identifications of [Appellee] on the ground that he should have obtained a warrant before obtaining [Appellee]'s name from his cell phone." Commonwealth's Rule 1925(b) Statement, 4/14/16, at 1 (single page). The

---

1. 18 Pa.C.S. §§ 2701, 2702, 2705, and 3733, respectively.

suppression court issued its Rule 1925(a) opinion on July 18, 2016.

■ The Commonwealth now presents the following question for our review: "Did the [suppression] court commit an error of law when it deemed [Appellee]'s identity suppressible fruit of an unlawful search?" Commonwealth's Brief at 3.

In reviewing an appeal by the Commonwealth of a suppression order, we may consider only the evidence from the appellee's witnesses along with the Commonwealth's evidence which remains uncontroverted. Our standard of review is restricted to· establishing whether the record supports the suppression court's factual findings; however, we maintain *de novo* review over the suppression court's legal conclusions.

*Commonwealth v. Brown*, 606 Pa. 198, 996 A.2d 473, 476 (2010).

Instantly, the Commonwealth does not dispute the suppression court's ruling that the search of Appellee's cell phone was unconstitutional. *See* Commonwealth's Brief at 6 n.1. Thus, our review in this case is limited to the scope of the suppression remedy afforded to Appellee as a result of that unconstitutional search. Based on that unconstitutional search, Appellee sought suppression of two categories of testimonial identification evidence by Officer Sanchez. First, the "out-of-court" identification testimony would consist of Officer Sanchez's testifying at trial about his identification of Appellee from the photo he discovered in the NCIC criminal database. Second, the "in-court" identification testimony would consist of Officer Sanchez's identifying Appellee, in court, as being the person whom the officer observed at the scene of the crime. The trial court granted

suppression with respect to both categories. On appeal, the Commonwealth argues that "the fruit of the poisonous tree doctrine ... has no application to eyewitness identifications. Neither a defendant's face, nor a witness's independent memory of that face from the crime, is suppressible." Commonwealth's Brief at 8.[2]

As will be addressed below, the import of much of the applicable case law in this matter is in dispute. Accordingly, we will address those disputes as they arise in our narrative of the jurisprudence that applies to this case.

In *Wong Sun v. U.S.*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), in a majority opinion authored by Justice Brennan, the Supreme Court of the United States defined the purpose and general scope of the exclusionary rule, and the related fruit-of-the-poisonous-tree doctrine, as follows:

In order to make effective the fundamental constitutional guarantees of sanctity of the home and inviolability of the person, ... this Court held nearly half a century ago that evidence seized during an unlawful search could not constitute proof against the victim of the search. *Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 [ (1914) ]. The exclusionary prohibition extends as well to the indirect as the direct products of such invasions. *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 [ (1920) ]. Mr. Justice Holmes, speaking for the Court in that case, in holding that the Government might not make use of information obtained during an unlawful search to subpoena from the victims the very documents illegally

---

**2.** Paradoxically, the Commonwealth states in its very next paragraph that "the Supreme Court has long 'eschewed any per se or 'but

for' rule' of exclusion." *Id.* at 8–9 (quoting *Dunaway v. New York*, 442 U.S. 200, 217, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979)).

viewed, expressed succinctly the policy of the broad exclusionary rule:

> The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all. Of course this does not mean that the facts thus obtained become sacred and inaccessible. If knowledge of them is gained from an independent source they may be proved like any others, but the knowledge gained by the Government's own wrong cannot be used by it in the way proposed.

[*Id.*] at 392, 40 S.Ct. 182[.]

The exclusionary rule has traditionally barred from trial physical, tangible materials obtained either during or as a direct result of an unlawful invasion. It follows from our holding in *Silverman v. United States*, 365 U.S. 505, 81 S.Ct. 679, 5 L.Ed.2d 734 [ (1961) ], that the Fourth Amendment may protect against the overhearing of verbal statements as well as against the more traditional seizure of 'papers and effects.' Similarly, testimony as to matters observed during an unlawful invasion has been excluded in order to enforce the basic constitutional policies. *McGinnis v. United States*, ... 227 F.2d 598 [ (1st Cir. 1955) ]. Thus, verbal evidence which derives so immediately from an unlawful entry and an unauthorized arrest as the officers' action in the present case is no less the 'fruit' of official illegality than the more common tangible fruits of the unwarranted intrusion. *See Nueslein v. District of Columbia*, ... 115 F.2d 690 [ (D.C. Cir. 1940) ]. Nor do the policies underlying the exclusionary rule invite any logical distinction between physical and verbal evidence. Either in terms of deterring lawless conduct by federal officers, *Rea v. United States*, 350 U.S. 214, 76 S.Ct. 292, 100 L.Ed. 233

[ (1956) ], or of closing the doors of the federal courts to any use of evidence unconstitutionally obtained, *Elkins v. United States*, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 [ (1960) ], the danger in relaxing the exclusionary rules in the case of verbal evidence would seem too great to warrant introducing such a distinction.

*Wong Sun*, 371 U.S. at 484–86, 83 S.Ct. 407 (footnote omitted).

Eyewitness identifications have at least sometimes been the subject of suppression under the fruit-of-the-poisonous-tree doctrine. In *Gilbert v. California*, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967), for instance, the defendant was subjected to an illegal line-up which had violated his Sixth Amendment right to counsel. Multiple witnesses testified *both* as eyewitnesses to Gilbert's crimes, and also regarding their identification of Gilbert at the illegal line-up. Thus, like here, there were at issue in *Gilbert* both out-of-court identifications that were the direct result of unconstitutional conduct, and in-court identifications stemming from observations made at the scene of the crime, prior to the unconstitutional conduct. The *Gilbert* Court ruled:

> The admission of the in-court identifications without first determining that they were not tainted by the illegal lineup but were of independent origin was constitutional error. *United States v. Wade*, [388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) ]. We there held that a post-indictment pretrial lineup at which the accused is exhibited to identifying witnesses is a critical stage of the criminal prosecution; that police conduct of such a lineup without notice to and in the absence of his counsel denies the accused his Sixth Amendment right to counsel and calls in question the admis-

sibility at trial of the in-court identifications of the accused by witnesses who attended the lineup. However, as in *Wade*, the record does not permit an informed judgment whether the in-court identifications at the two stages of the trial had an independent source. Gilbert is therefore entitled only to a vacation of his conviction pending the holding of such proceedings as the California Supreme Court may deem appropriate to afford the State the opportunity to establish that the in-court identifications had an independent source, or that their introduction in evidence was in any event harmless error.

Quite different considerations are involved as to the admission of the testimony of the manager of the apartment house at the guilt phase and of the eight witnesses at the penalty stage that they identified Gilbert at the lineup. That testimony is the direct result of the illegal lineup 'come at by exploitation of [the primary] illegality.' *Wong Sun*[,] 371 U.S. [at] 488, 83 S.Ct. 407 . . . . The State is therefore not entitled to an opportunity to show that that testimony had an independent source. Only a *per se* exclusionary rule as to such testimony can be an effective sanction to assure that law enforcement authorities will respect the accused's constitutional right to the presence of his counsel at the critical lineup.

*Gilbert*, 388 U.S. at 272–73, 87 S.Ct. 1951 (footnotes omitted).

Thus, the *Gilbert* decision strongly suggests that, regarding *both* in-court identifications and testimony regarding out-of-court identifications, such identity-related testimonial evidence is *potentially* suppressible. Moreover, *Gilbert* suggests that

identification testimony which is made possible only as a direct result of unconstitutional conduct should be suppressed to deter police exploitation of such conduct (in *Gilbert*, this was the testimony by witnesses about having identified Gilbert in the unconstitutional line-up). However, the Court also held that the state should be afforded the opportunity to prove that the in-court identifications (based on direct observations of the criminal conduct), were admissible if such testimony was 'untainted' by the unconstitutional acts, by showing an independent source for such testimony.[3] Thus, the *Gilbert* decision appears to implicitly reject the theory proffered by the Commonwealth today (that eyewitness testimony is *never* suppressible).

Thirteen years later, the United States Supreme Court issued *United States v. Crews*, 445 U.S. 463, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980). In *Crews*, the perpetrator robbed and assaulted a victim at gunpoint, and the victim thereafter gave a full description of the culprit to the police. Several days later, police officers saw the defendant, who matched the description provided by the victim, near the scene of the crime. Police arrested him under false pretenses (alleging truancy), and then questioned and photographed the defendant while he was briefly in their custody. Subsequently, the victim identified the defendant from the photo obtained as a result of that illegal arrest.

The trial court in *Crews* granted suppression with respect to the victim's out-of-court identification of the defendant, but refused to suppress the victim's in-court identification of him. The D.C. Court of Appeals reversed, holding that the in-court testimony should have also been sup-

---

**3.** Alternatively, the Court noted, Gilbert was not entitled to relief if it could be shown that

the testimony constituted harmless error.

pressed as fruit of the illegal arrest. The Supreme Court then reversed the D.C. Court of Appeals' decision, concluding that the in-court identification was not the product of, or had been otherwise tainted by, the police misconduct. Notably, the majority decision in *Crews* only addressed the admissibility of the victim's in-court identification of the defendant.

In ruling that the in-court identification should not have been suppressed, Justice Brennan, speaking for the majority, stated as follows:

### A

In this case, the robbery victim's presence in the courtroom at respondent's trial was surely not the product of any police misconduct. She had notified the authorities immediately after the attack and had given them a full description of her assailant. The very next day, she went to the police station to view photographs of possible suspects, and she voluntarily assisted the police in their investigation at all times. Thus this is not a case in which the witness' identity was discovered or her cooperation secured only as a result of an unlawful search or arrest of the accused. Here the victim's identity was known long before there was any official misconduct, and her presence in court is thus not traceable to any Fourth Amendment violation.

### B

Nor did the illegal arrest infect the victim's ability to give accurate identification testimony. Based upon her observations at the time of the robbery, the victim constructed a mental image of her assailant. At trial, she retrieved this mnemonic representation, compared it to the figure of the defendant, and positively identified him as the robber. No part of this process was affected by respondent's illegal arrest. In the language of the "time-worn metaphor" of the poi-sonous tree, *Harrison v. United States*, 392 U.S. 219, 222, 88 S.Ct. 2008, 2010, 20 L.Ed.2d 1047 (1968), the toxin in this case was injected only after the evidentiary bud had blossomed; the fruit served at trial was not poisoned.

This is not to say that the intervening photographic and lineup identifications—both of which are conceded to be suppressible fruits of the Fourth Amendment violation—could not under some circumstances affect the reliability of the in-court identification and render it inadmissible as well. Indeed, given the vagaries of human memory and the inherent suggestibility of many identification procedures, just the opposite may be true. But in the present case the trial court expressly found that the witness' courtroom identification rested on an independent recollection of her initial encounter with the assailant, uninfluenced by the pretrial identifications, and this determination finds ample support in the record. In short, the victim's capacity to identify her assailant in court neither resulted from nor was biased by the unlawful police conduct committed long after she had developed that capacity.

### C

Insofar as respondent challenges his own presence at trial, he cannot claim immunity from prosecution simply because his appearance in court was precipitated by an unlawful arrest. An illegal arrest, without more, has never been viewed as a bar to subsequent prosecution, nor as a defense to a valid conviction. *Gerstein v. Pugh*, 420 U.S. 103, 119, 95 S.Ct. 854, 865, 43 L.Ed.2d 54 (1975); *Frisbie v. Collins*, 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541 (1952); *Ker v. Illinois*, 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421 (1886). The exclusionary principle of *Wong Sun* and *Silverthorne Lumber Co.* delimits what proof the

Government may offer against the accused at trial, closing the courtroom door to evidence secured by official lawlessness. Respondent is not himself a suppressible "fruit," and the illegality of his detention cannot deprive the Government of the opportunity to prove his guilt through the introduction of evidence wholly untainted by the police misconduct.

*Crews*, 445 U.S. at 471–74, 100 S.Ct. 1244 (footnotes omitted).

4. The parties disagree about the import of the subsequent section of Justice Brennan's opinion, part II–D, wherein Justice Brennan declined to address "whether respondent's *person* should be considered evidence, and therefore a possible 'fruit' of police misconduct." *Id.* at 475, 100 S.Ct. 1244 (emphasis added). The Commonwealth argues that a majority of the *Crews* Court did in fact reach that question, and "categorically concluded than an identification cannot be suppressed as a fruit of the poisonous tree, even if the identification was the product of an unlawful arrest." Commonwealth's Brief at 14 (citing *Crews*, 445 U.S. at 477, 100 S.Ct. 1244 (Powell, J., concurring), and 445 U.S. at 477–79, 100 S.Ct. 1244 (White, J., concurring)).

It is true that Justice Brennan did not write for the majority in *Crews* with respect to part II–D. However, the Commonwealth plainly misconstrues the import of this fact. In his concurring opinion, Justice Powell, who was joined by Justice Blackmun, wrote:

I join the Court's opinion except for Part II–D. I would reject explicitly, rather than appear to leave open, the claim that a defendant's face can be a suppressible fruit of an illegal arrest. I agree with MR. JUSTICE WHITE's view, post, at 1253–1254, that this claim is foreclosed by the rationale of *Frisbie v. Collins*, 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541 (1952), and *Ker v. Illinois*, 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421 (1886). Those cases establish that a defendant properly may be brought into court for trial even though he was arrested illegally. Thus, the only evidence at issue in this case is the robbery victims' identification testimony. I agree with the Court that the victims' testimony is not tainted.

*Crews*, 445 U.S. at 477, 100 S.Ct. 1244 (Powell, J., concurring). Clearly, Justices Powell

Although not directly at issue in *Crews*, it is clear the majority decision did not countenance the theory that eyewitness identification testimony is categorically not suppressible. The *Crews* Court also drew a sharp distinction between 'identity' itself—that is, the *presence of the defendant at trial*—which is never suppressible, and eyewitness identification testimony, both of the in-court and out-of-court variety such as at issue in this case, which is *potentially* suppressible.[4]

and Blackmun, while expressly rejecting the notion that a person's identity itself (his physical presence in court) can be suppressed, expressed no dissent with respect to the remainder of the Majority opinion, which clearly had analyzed the case as if eyewitness identification testimony was suppressible, unless such testimony could be divorced from the taint of the unconstitutional police conduct. Likewise, Justice White's concurring opinion, which was joined by Justice Rehnquist and Chief Justice Burger, addressed identity only in terms of the defendant's physical presence in court, *i.e.*, whether the defendant's 'face' is itself suppressible. They did not address at all whether eyewitness identification testimony can be suppressed categorically. Indeed, the manner in which Justice White discussed the in-court identification of the defendant reveals he favored applying a taint analysis to the in-court identification testimony, something that would be wholly unnecessary if such testimony was categorically not suppressible. He wrote: "As I understand Part II–D of MR. JUSTICE BRENNAN's opinion, however, the in-court identification might have been inadmissible had there not been some reason to suspect Crews of the offense at the time of his illegal arrest. Such a rule excluding an *otherwise untainted*, in-court identification is wholly unsupported by our previous decisions." *Id.* at 478, 100 S.Ct. 1244 (White, J., concurring) (emphasis added).

Accordingly, we must reject the Commonwealth's interpretation of *Crews*. As is apparent throughout its brief, the Commonwealth conflates evidence *about* identity, such as eyewitness identification testimony, with 'identity' in terms of a defendant's actual body, his physical presence in court, or, as the United

Nevertheless, the Commonwealth relies on a later Supreme Court decision to support its theory: *I.N.S. v. Lopez-Mendoza et al.*, 468 U.S. 1032, 104 S.Ct. 3479, 82 L.Ed.2d 778 (1984). Appellee and the trial court, by contrast, find *Lopez-Mendoza* inapplicable to this case. In that case, Lopez-Mendoza, an illegal immigrant, objected to being summoned into court because he has ostensibly been unlawfully arrested by an Immigration and Naturalization Service ("INS") agent. Sandoval–Sanchez, another defendant in the case, and also an illegal immigrant, objected to evidence *about* his illegal entry, premised on the notion such evidence was fruit of the poisonous tree stemming from his ostensibly illegal arrest.

With respect to Lopez-Mendoza, the Court ruled that "[t]he 'body' or identity of a defendant or respondent in a criminal or civil proceeding is never itself suppressible as a fruit of an unlawful arrest, even if it is conceded that an unlawful arrest, search, or interrogation occurred." *Id.* at 1039, 104 S.Ct. 3479. The High Court further explained that, "[a]t his deportation hearing[,] Lopez–Mendoza objected only to the fact that he had been summoned to a deportation hearing following an unlawful arrest; he entered no objection to the evidence offered against him." *Id.* at 1040, 104 S.Ct. 3479.

However, the Supreme Court noted that

Sandoval–Sanchez ha[d] a more substantial claim. He objected not to his compelled presence at a deportation proceeding, but to evidence offered at that proceeding. The general rule in a criminal proceeding is that statements and other evidence obtained as a result of an unlawful, warrantless arrest are suppressible if the link between the evidence and the unlawful conduct is not too attenuated.

*Id.* at 1040–41, 104 S.Ct. 3479 (citing *Wong Sun, supra* ). Nevertheless, the Supreme Court ultimately held that "the exclusionary rule [does not apply] in civil deportation hearings held by the INS." *Id.* at 1050, 104 S.Ct. 3479. Accordingly, Sandoval–Sanchez was not entitled to suppression of the evidence obtained as the fruit of his illegal arrest.[5]

Instantly, the Commonwealth's theory relies heavily on the *Lopez-Mendoza* decision, especially the Court's statement that "[t]he 'body' or identity of a defendant or respondent in a criminal or civil proceeding is never itself suppressible as a fruit of an unlawful arrest. . . ." *Id.* at 1039, 104 S.Ct. 3479. However, two things give us pause about the direct implications of *Lopez-Mendoza*. First, that decision cannot be divorced from its context: neither of the litigants in *Lopez-Mendoza* brought their claims in a criminal trial, and the Court's decision was clearly premised, in part, on the distinction between remedies available in the civil setting, such as in an

States Supreme Court often characterizes it, his 'face.' While a majority of the *Crews* Court outright rejected the notion that a defendant can seek suppression of 'identity' itself, the entire *Crews* Court clearly distinguished 'identity itself' from 'evidence *about* identity,' which could be either physical (*e.g.*, fingerprints) or testimonial evidence (eyewitness identification testimony). The Commonwealth makes virtually no effort to recognize this distinction, or merely, and unconvincingly, concludes that the two concepts are indistin-

guishable. However, the text of every opinion of the *Crews* Court demonstrates an understanding of the distinction. While Justice Brennan may have been open to suppressing 'identity itself' in certain contexts, none of the opinions even remotely suggest that evidence 'about identity' is categorically not suppressible.

5. The evidence at issue was statements made by Sandoval–Sanchez following his arrest in which he admitted to unlawfully entering the country.

immigration proceeding, as opposed to criminal courts, where protections against unconstitutional government conduct is stronger. Second, and more importantly, to the extent that the *Lopez-Mendoza* decision states principles that do extend to criminal law, we are not convinced that the non-suppressibility of "[t]he 'body' or identity of a defendant[,]" encompasses anything more than a defendant's inability to object to his own physical presence in the courtroom. *Id.* That was the specific nature of the claim by Lopez-Mendoza which was rejected by the Supreme Court—that his illegal arrest should preclude the government from even bringing him into court. With regard to Sandoval–Sanchez, however, who objected to evidence *about* his identity, not merely to his physical presence in court, the Court did not apply any blanket rule to exclude such "identity" evidence, but instead rejected Sandoval–Sanchez's claim because the suppression remedy was not available in a civil forum.

In this case, Appellee did not raise an objection at all similar to that raised by Lopez-Mendoza. Appellee did not seek to prevent the Commonwealth from bringing his 'body' into court. Instead, Appellee objected to *testimonial evidence* by a police officer (who was also a witness to the underlying crime), through which the Commonwealth sought to establish Appellee's 'identity' as the perpetrator of the crime. This distinction is far from trivial. It is the difference between whether the government can bring you into a court to face charges *at all*, versus whether certain evidence by witnesses who would identify you in that courtroom is suppressible. The instant matter bears far more in common with the facts and procedural history of

*Gilbert* than it does with the *Lopez-Mendoza* decision's treatment of Lopez-Mendoza's claim. Accordingly, we reject the Commonwealth's assertion that *Lopez-Mendoza* stands for the proposition that eyewitness identification testimony is categorically insuppressible.

In the interim between *Gilbert* and *Lopez-Mendoza*, the Supreme Court of Pennsylvania issued a decision in *Commonwealth v. Garvin*, 448 Pa. 258, 293 A.2d 33 (1972). The Commonwealth argues that *Garvin*, controlling authority for this Court, also categorically bans the suppression of eyewitness identification testimony, while Appellee contends that no such categorical ban was established in *Garvin*.[6]

In *Garvin*, the defendant sought the suppression of identification evidence which was procured as the result of an illegal arrest. As the *Garvin* Court explained:

On August 14, 1969, at about 1:30 P.M., Mrs. Ferro, the owner of a beauty salon, was in her shop with her friend, Mrs. Maloney, when [Garvin] and his accomplice, Thomas Leging, entered and announced their intention of robbing the two ladies. While the intruders were in the shop, Leging produced a gun to support their demands for money and Garvin struck Mrs. Maloney, knocking her to the floor, and removed $68.00 from her purse. The Commonwealth's testimony established that the two men were in the presence of the victims for approximately five min[ut]es, the lighting conditions were good and the ladies had ample opportunity to observe both men. Shortly after the men fled the police apprehended Leging, who subse-

---

6. Appellee alternatively argues that if *Garvin* did establish a categorical ban on eyewitness identification testimony, it was wrongly decided. As an intermediate appellate court, however, we cannot refuse to apply the *Garvin* decision, much less overturn it. Nevertheless, for the reasons that follow, we reject the assertion that it did establish such a ban, so we do not reach Appellee's alternative argument.

quently entered a plea of guilty in a separate proceeding.

The first assignment of error was the lower court's refusal to suppress the identification evidence which they contended to be the fruits of an illegal arrest. This challenged arrest of Garvin occurred approximately three weeks later on September 4, 1969, when Officer Covotta, a member of the Philadelphia Police Department, received information by telephone as to the whereabouts of [Garvin]. He immediately proceeded to the designated location and placed him under arrest. After taking Garvin into custody, Officer Covotta took him directly to the beauty salon where Mrs. Ferro identified him as the other man in the holdup. Both Mrs. Ferro and Mrs. Maloney made positive in-court identifications of Garvin at the trial. It is significant that there has been no objection raised by the appellant to the manner in which the out-of-court confrontation with Mrs. Ferro was conducted or the absence of counsel at that time. Further, *the request for suppression of the identification was made without distinction between the in-court and out-of-court identifications and was predicated solely on the theory that each was a fruit of an illegal arrest.* Therefore, the issue as framed is whether the arrest was illegal and if the arrest is determined to have been illegal, whether the subsequent identification was tainted by that illegality.

*Id.* at 35 (emphasis added).

After first concluding that Garvin's arrest was illegal, *id.* at 36, the Pennsylvania Supreme Court then turned to consider the scope of the suppression remedy available, *id.* at 37, and introduced the latter discussion with the following comment:

Although we agree with [Garvin] as to the illegality of the arrest we must dis-

agree with his contention that the identifications must be suppressed. No law abiding society could tolerate a presumption that but for the illegal arrest the suspect would never have been required to face his accus[e]rs. Thus, we conclude that the only effect of the illegal arrest was to hasten the inevitable confrontation and not to influence its outcome.

*Garvin*, 293 A.2d at 37. No citation to any prior authority accompanied this statement. Nevertheless, the Commonwealth asserts that it constitutes a "binding and emphatic ... pronouncement[ ]" by our Supreme Court. Commonwealth's Brief at 10.

However, the subsequent analysis provided by the *Garvin* Court appears far more grounded in pre-existing precedent than its introductory statement might suggest. Far from applying a categorical ban on the suppression of identity evidence that the Commonwealth asserts in this case, the *Garvin* Court took a far more nuanced approach more in line with *Wong Sun* and *Gilbert*:

In discussing the scope of the effect of the prophylactic exclusionary rule where there has been an unlawful invasion by the Government, the United States Supreme Court in *Wong Sun* ... stated: "The exclusionary rule has traditionally barred from trial physical, tangible material obtained either during or as a direct result of an unlawful invasion." 371 U.S. at 485, 83 S.Ct. at 416. Significantly, the Supreme Court made it clear that an illegal arrest does not bar all evidence subsequent to that arrest when it concluded: "We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting estab-

lishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." 371 U.S. at 487–488, 83 S.Ct. at 417. The Supreme Court further recognized that the evidence should not be excluded when "the connection between the arrest and the ... (evidence obtained) had 'become so attenuated as to dissipate the taint.'" 371 U.S. at 491, 83 S.Ct. at 419.

In those cases where the exclusionary doctrine has been applied the questioned evidence derived so immediately from the unauthorized arrest that its relationship to the illegality was readily apparent. To fail to impose sanctions in those instances would "leave law-abiding citizens at the mercy of the officers' whim or caprice." *Brinegar v. United States*, 338 U.S. 160, 176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949). When, however, we are concerned with identification evidence where, as here, the testimonial evidence did not derive from 'exploitation' of any illegality, the reason to employ the sanction is non-existent.

The illegal arrest in this instance merely provided the means for the confrontation with Mrs. Ferro more promptly than would otherwise have been the case. The arrest played no part in the identification of Mrs. Maloney who after the incident did not meet Garvin again until the day of the trial. We cannot assume that but for the illegal arrest the appellant would have remained at large indefinitely. In either case it is clear that the illegality contributed neither to the knowledge of the witnesses nor to the accuracy of their identifications.

*Garvin*, 293 A.2d at 37–38 (footnotes omitted).

Nothing in the *Garvin* Court's analysis suggests anything close to an absolute bar on the suppression of eyewitness identifications now proffered by the Commonwealth in this case. Instead, the *Garvin* Court clearly employed the taint/independent-source test, as was applied in *Gilbert*, and determined that the evidence sought to be suppressed by Garvin had not been tainted by the illegal conduct *under the facts of that case*. The *Garvin* Court did not distinguish between the in- and out-of-court identification for purposes of suppression; however, that was not at all surprising given the Court's comment that "the request for suppression of the identification was made without distinction between the in-court and out-of-court identifications and was predicated solely on the theory that each was a fruit of an illegal arrest." *Garvin*, 293 A.2d at 35. Accordingly, we reject the Commonwealth's assertion that *Garvin* stands for the proposition that the Pennsylvania Supreme Court "has categorically rejected the application of the fruit of the poisonous tree doctrine to eyewitness identifications." Commonwealth's Brief at 9. No such language appears in the *Garvin* decision, and the *Garvin* Court's application of the taint/independent-source doctrine to the eyewitness identification at issue in that case runs directly contrary to any such rule.

To be thorough, we also consider the Commonwealth's citation of this Court's application of *Garvin* in *Commonwealth v. Howard*, 442 Pa.Super. 337, 659 A.2d 1018 (1995). In *Howard*, this Court overturned a trial court's suppression of photo array identification and fingerprinting that occurred after the defendant's illegal arrest. Notably, immediately after citing *Garvin*, the *Howard* Court stated that "the courts have refused to suppress identification evidence *where it was untainted by any illegal police conduct*." *Howard*,

659 A.2d at 1022 (emphasis added). Clearly, that italicized phrase is fundamentally unnecessary if there is a categorical bar applicable to the suppression of eyewitness identifications. Moreover, in describing the *Garvin* decision, the *Howard* Court stated that the *Garvin* Court "declin[ed] to suppress identification evidence, despite the defendant's unlawful arrest, *where the illegality did not contribute to either the victims'/witnesses' knowledge or the accuracy of their identification." Id.* at 1023 (emphasis added).

Moreover, the *Howard* Court clearly applied a taint analysis to the eyewitness identifications at issue in that case. The Court certainly rejected, consistent with the authorities discussed above, the suppression of the defendant's identity itself. *Id.* at 1022 (rejecting the appellant's argument that but for the police misconduct, "the police would not have discovered his true name or identity," because "a defendant's face cannot be a suppressible fruit of an illegal arrest[,]" citing *Crews,* 445 U.S. at 477–479, 100 S.Ct. 1244). However, the Court clearly applied a taint analysis when considering whether Howard's victim's in-court identification testimony should have been suppressed. *Id.* at 1023 (holding that "the lower court properly refused to suppress the victims' in-court identifications *as they were not tainted by the photographic array and were supported by an adequate independent basis.*") (emphasis added).

■ Accordingly, after reviewing the case law cited by the Commonwealth, we conclude that its claim that eyewitness identification testimony is *never* suppressible under the fruit-of-the-poisonous tree doctrine is demonstrably false. The claim itself appears rooted in a misperception about the meaning of 'identity' as that term has been used by both the federal and state courts. The Commonwealth con-

flates 'identity itself'—which, if suppressed, would effectively prevent the government from bringing a defendant to trial at all—with *evidence about identity,* such physical evidence establishing a defendant's identity (fingerprints, photographs, etc.), as well as testimonial evidence by an eyewitness about their in- or out-of-court identifications of the defendant as the perpetrator of a crime. All evidence about identity is potentially suppressible as fruit of the poisonous tree stemming from unconstitutional police conduct. However, suppression is not automatic—any such evidence may be admitted where the Commonwealth sufficiently proves that it was either untainted by the illegal conduct, or because it was discoverable through an independent source.

■ In the instant matter, the trial court suppressed *both* Officer Sanchez's out-of-court identification of Appellee, which occurred immediately after he conducted his unconstitutional search of Appellee's phone, as well as the officer's in-court identification of Appellee based on his observations from the scene of the crime. For the reasons that follow, we agree with the court's decision to suppress the out-of-court identification, but disagree with the suppression of the in-court identification.

The trial court concluded that Officer Sanchez's identification of Appellee's photo was the direct product or fruit of the illegal search of Appellee's phone. SCO at 7. We find no reason to disturb this determination.

■ The purpose of suppression of evidence is "not to exclude such evidence because it is testimonially untrustworthy or lacking in reliability[,] but to discourage police officials from conduct in violation of the Constitution." *Commonwealth v. Edmunds,* 526 Pa. 374, 586 A.2d 887, 908

(1991) (quoting *Commonwealth ex rel. Wilson v. Rundle*, 412 Pa. 109, 194 A.2d 143, 148 (1963)). Although the suppression remedy extends to both indirect and direct products of unconstitutional invasions, *see Crews*, 445 U.S. at 470, 100 S.Ct. 1244 (quoting *Silverthorne* ), suppression is not appropriate "when the chain of causation proceeding from the unlawful conduct has become so attenuated or has been interrupted by some intervening circumstance so as to remove the 'taint' imposed upon that evidence by the original illegality." *Id.* at 471, 100 S.Ct. 1244. Here, we agree with the trial court that Officer Sanchez's out-of-court identification of Appellee was the direct product of his unconstitutional search of Appellee's cellphone. Suppression of Officer Sanchez's testimony about that out-of-court identification is absolutely necessary to deter such illegal searches, and such testimony cannot be sufficiently divorced from the taint of Officer Sanchez's own illegal conduct.

We are aware that, in *Howard*, this Court declined to suppress the witnesses' out-of-court identifications of the defendant because the victims had observed him prior to any unlawful police conduct—in that case, an illegal arrest. Those circumstances are *somewhat* similar to the instant case, but not entirely. There are distinguishing features of this case which lead us to conclude that *Howard* is not controlling in this instance.

Most importantly, the witnesses in *Howard* had nothing to do with the illegal arrest itself. The legality of the defendant's arrest in Howard had little or no

bearing on the conduct of the witnesses in selecting the defendant from a photo array. Accordingly, there was little or no deterrent effect likely from suppression with respect to the illegal arrest, and the identifications could easily be viewed as untainted by the illegal conduct.

Here, however, not only was the illegal conduct in question an unconstitutional search rather than an illegal arrest,[7] the witness in question was the very same officer who had conducted the search which violated Appellee's Fourth Amendment rights. The officer did not select Appellee out of a photo array, as the witnesses in *Howard* had done, but instead identified him from a single photo, which he only discovered as the direct result of his unconstitutional search. It is for those reasons that the taint of the illegal search cannot be disentangled from the officer's testimony about the immediate product of the illegal search—his identification of Appellee through the NCIC photograph.

While it is true that the photograph itself existed prior to the illegal search, it is not unreasonable for the trial court to have concluded that the officer's testimony about the immediate results of his illegal conduct was necessarily tainted by that conduct. Moreover, failing to suppress such testimony would leave such unconstitutionality undeterred. For these reasons, we affirm the trial court's suppression order with respect to Officer Sanchez's out-of-court identification testimony, as the "chain of causation proceeding from the unlawful conduct" had not "become so at-

---

**7.** The fruit-of-the-poisonous tree doctrine, as the Commonwealth correctly argues, is not fundamentally different when the unconstitutional act is an illegal arrest rather than an illegal search. However, in practical terms, that difference may, as it does in this case, present substantially different considerations when applying the taint/independent source test. In *Howard*, the illegal arrest conducted by the police officer had little to do with the witness's testimony. Here, because the unconstitutional act was committed by the witness whose testimony was being considered for suppression, it is much more difficult to divorce the taint of the illegal conduct from the testimony sought to be suppressed.

tenuated ... so as to remove the 'taint' imposed upon that evidence by the original illegality." *Crews*, 445 U.S. at 471, 100 S.Ct. 1244. Put another way, Officer Sanchez's out-of-court identification of Appellee was the direct and immediate exploit of his illegal search.[8]

■ However, we find the trial court's justification for suppressing Officer Sanchez's in-court identification testimony far less convincing. With regard to that testimony, Officer Sanchez's status as the officer who committed the unconstitutional search is far less relevant to the 'taint' attached to his in-court identification testimony. Officer Sanchez could have identified Appellee in-court, based on his observation of Appellee made prior to the unconstitutional search, whether or not his illegal conduct ultimately hastened that in-court confrontation. *See Garvin*, 293 A.2d at 37 (noting that the effect of the unconstitutional arrest had only hastened the inevitable in-court confrontation, but did not influence its outcome). As the *Garvin* Court stated:

> We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'

*Id.* (quoting *Wong Sun*, 371 U.S. at 487–88, 83 S.Ct. 407). Here, Officer Sanchez's ability to identify Appellee in-court existed independently of, and arose prior to, the illegal act which otherwise corrupted his out-of-court identification.

In concluding that Officer Sanchez's in-court identification testimony should also be suppressed, the trial court relied extensively on *Davis v. Mississippi*, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969). In that case, during the course of investigating a rape, the police engaged in a fishing expedition by stopping, interrogating, and fingerprinting several black youths without probable cause to do so. Davis was one of those youths, and his fingerprints ultimately were shown to match those found at the scene of the crime. The sole issue involved in *Davis* was "whether [the] fingerprints obtained from [Davis] should have been excluded from evidence as the product of a detention which was illegal under the Fourth and Fourteenth Amendments." *Davis*, 394 U.S. at 722, 89 S.Ct. 1394.

The Supreme Court of Mississippi had ruled that "fingerprint evidence, because of its trustworthiness, is not subject to the proscriptions of the Fourth and Fourteenth Amendments." *Id.* at 723–24, 89 S.Ct. 1394. The *Davis* Court rejected that conclusion, because "[t]he exclusionary rule was fashioned as a sanction to redress and deter overreaching governmental conduct prohibited by the Fourth Amendment. To make an exception for illegally seized evidence which is trustworthy would fatally undermine these purposes." *Id.* at 724, 89 S.Ct. 1394.

Instantly, the trial court below found *Davis* comparable to the instant case, because "the only evidence connecting [Appellee's] identity to the instant charges were first discovered through Officer Sanchez's illegal search of [his] cell phone." SCO at 11. "As such, Officer Sanchez's

---

8. To the extent our analysis differs somewhat from that of the lower court, *see* SCO at 6–7, we reiterate that we are not bound by the legal conclusions of that court and, thus, we may affirm its decision to suppress on any legal basis. *See Brown*, 996 A.2d at 476.

warrantless search directly *brought about [Appellee's] identity*. Similar to the conduct in ***Davis***, had it not been for the unlawful search of [Appellee's] cell phone, his name, personal information, and photograph would not have come to fruition and he would never have become a suspect." *Id.* at 11–12 (emphasis added).

■ However, ***Davis*** did not concern the suppressibility of testimonial evidence at all, and so the holding in that case is of limited value here by way of direct analogy. Still, it appears from the trial court's analysis that it is doing exactly what has clearly been rejected in all of the above authorities—permitting the suppression of identity itself. More specifically, the court appears to exclude Officer Sanchez's in-court testimony based on the theory that Appellee's identity could not have been discovered but for the unconstitutional search. As discussed at length above, *identity itself* is never suppressible. Officer Sanchez's in-court identification testimony is *evidence about identity* and, therefore, it is *potentially suppressible* in the right circumstances; however, suppression of *evidence about identity* cannot be premised upon the theory that the Commonwealth is not entitled to know a defendant's identity at all, as such would effectively be no different from suppressing identity itself, a theory that has been expressly rejected. *See Garvin, Crews, supra.* In ***Davis***, the fingerprints in question were *evidence about identity*. That evidence was secured as the direct and immediate result of an unconstitutional act and, accordingly, it should have been suppressed, according to the ***Davis*** Court. Here, however, the *evidence about identity* in question could have been offered if the unconstitutional act had never occurred. Thus, the fingerprints at issue in ***Davis*** are simply not

analogous to Officer Sanchez's in-court identification testimony. Hypothetically, an analogy could be drawn to Davis' victim had she identified him in court as her rapist. In such a scenario, that victim's in-court identification testimony should not be suppressed on the premise that Davis' identity was only discovered because of his unconstitutional detention, if the victim based her identification testimony on observations she made during the commission of the rape.

■ The nuanced, but critical distinction to make is whether evidence about identity has been tainted by illegal conduct or whether the relationship between the illegality and the evidence is tenuous; the question is not whether the perpetrator's identity itself was *likely* to have been discovered without the illegality. As this Court has previously stated, "we cannot assume that but for the illegal [act, the accused] would have remained at large indefinitely." ***Commonwealth v. Ryan***, 253 Pa.Super. 92, 384 A.2d 1243, 1247 (1978) (citing ***Garvin***). This distinction is the implicit and practical consequence of the rule that identity itself is never suppressible, while evidence about identity is.

In sum, because we reject the trial court's justification for suppressing Officer Sanchez's in-court identification testimony, and because we can contemplate no other legal basis for suppression of that testimony that does not effectively permit the suppression of identity itself, we must reverse that aspect of the trial court's suppression order. However, because Officer Sanchez's out-of-court identification testimony constituted evidence resulting directly and immediately from his unconstitutional search of Appellee's cell phone, we affirm the trial court's suppression of that evidence.[9]

9. We offer no opinion as the lower court's

decision to suppress the NCIC photograph, as

Order *affirmed* in part, *reversed* in part. Case *remanded* for further proceedings consistent with this opinion. Jurisdiction *relinquished*.

the Commonwealth has neither raised nor preserved such a claim for our review.