**[J-93-2018]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**


**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**


| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 1 EAP 2018 |
| | : | |
| Appellee | : | Appeal from the Order of the Superior |
| | : | Court entered on April 20, 2017 at No. |
| | : | 1191 EDA 2016 affirming in part, |
| v. | : | reversing in part and remanding the |
| | : | Order entered on March 18, 2016 in |
| | : | the Court of Common Pleas, |
| ANGEL SANTIAGO, | : | Philadelphia County, Criminal |
| | : | Division, at No. CP-51-CR-0000903- |
| Appellant | : | 2015. |
| | : | |
| | : | ARGUED: December 6, 2018 |


**OPINION**


**JUSTICE TODD**                                                   **DECIDED: June 18, 2019**

The "fruit of the poisonous tree" doctrine prohibits the admission of evidence at trial that was tainted by unconstitutional actions by law enforcement officials. Certain exceptions, however, exist to this doctrine. In this appeal by allowance, we consider whether a police officer's initial observations of a defendant at the scene of a crime, followed by a warrantless search of a cellular telephone left at the scene, which leads to the discovery of defendant's identity, taints the officer's subsequent in-court identification of the defendant. For the reasons set forth below, we find, under the fruit of the poisonous tree doctrine, that an identification made as a result of a warrantless search of the contents of a cell phone renders such identification tainted and inadmissible. However, a pre-search identification of a defendant may be admissible, if independent of the taint

of the subsequent unconstitutional search.  Thus, we affirm the order of the Superior Court.

On July 31, 2014, at approximately 6:50 p.m., Philadelphia Police Officer Paul Sanchez was on foot patrol with his partner on the 3500 block of Randolph Street in Philadelphia when he observed a Mitsubishi Galant operating with a heavily tinted windshield in violation of the Motor Vehicle Code.[1]  When Officer Sanchez waved the car down, the driver, Appellant Angel Santiago, pulled over and lowered the driver's side window as the officer approached that side of the vehicle.  Appellant seemed nervous and avoided eye contact with Officer Sanchez, who asked for Appellant's license, registration, and insurance information.  Appellant replied that he had no license.  The officer estimated that one to two minutes elapsed during the exchange during which he had the opportunity to observe Appellant's behavior at close range.  When the officer directed Appellant to turn off the vehicle, Appellant did not comply with this request, and began to reach into the center console.  Officer Sanchez immediately reached through the window and grabbed Appellant's arm to prevent him from retrieving anything from the console.

When Officer Sanchez grabbed Appellant's arm, Appellant accelerated the car with half of the officer's body still inside it.  Officer Sanchez repeatedly requested Appellant to pull over as Appellant sped away.  Officer Sanchez released his grip on the driver, causing the officer to be thrown away from the vehicle and onto the road, and Appellant's vehicle ran over Officer Sanchez's right foot.  The officer later required medical treatment for his injuries.  At no time during the encounter did Officer Sanchez learn the driver's name or identity.

---

[1] 75 Pa.C.S. § 4524(e)(1).

Immediately after Appellant fled the scene, Officer Sanchez and other officers returned to the location of the original traffic stop and retrieved a cell phone on the ground. Officer Sanchez opened the phone and accessed it, without securing a search warrant, in an attempt to ascertain the identity of the phone's owner.[2]  Only two contacts were found in the phone, neither of which was immediately displayed upon opening the phone; rather, the officer had to affirmatively navigate through the phone and select the necessary functions to make the names and phone numbers appear on the screen.  The first contact was "Angel Santiago," and the second one was "My Babe."  Officer Sanchez called the contact "My Babe," but no one answered.

Later that day, a detective assigned to the case ran a search of the name Angel Santiago through the National Crime Information Center ("NCIC") database.[3]  As a result of the search, the detective obtained a recent prison release photograph of an Angel Santiago in the Philadelphia area.  When the detective showed Officer Sanchez the photograph, the officer immediately identified the pictured individual as the driver of the vehicle.  Based on that identification and information the officer provided when interviewed about his encounter with Appellant, an arrest warrant was issued, and ultimately Appellant was arrested and charged with aggravated assault and other crimes.

Appellant filed an omnibus pre-trial motion seeking, *inter alia*, to suppress Officer Sanchez's anticipated testimony at trial regarding his out-of-court identification of Appellant from the criminal database photograph, and his in-court identification of

---

[2]  The Commonwealth concedes the cell phone was not voluntarily abandoned in light of its dislodging during the struggle between the Appellant and Officer Sanchez, and, thus, that the search of the phone without a warrant was illegal.

[3] The NCIC is an electronic clearinghouse of criminal data that can be accessed by most criminal justice agencies nationwide, to assist in the apprehension of fugitives, locate missing persons, recover stolen property, and identify terrorists.  *See generally* www.fbi.gov/services.cjis.ncic.

Appellant at trial, asserting that any identification of Appellant by the officer would be solely the product of the officer's unconstitutional warrantless search of the contacts in Appellant's cell phone – *i.e.*, the fruit of the poisonous tree.[4]

At the suppression hearing, Appellant did not contest whether Officer Sanchez had a sufficient opportunity to view Appellant, the clarity of the observation, or the officer's ability to examine Appellant's face. N.T., 2/19/16, at 39 ("It's not the fruit itself that is the issue. It is not the in court identification. Again, I am not arguing that the officer didn't have enough time to look at my client, and was it dark outside, you know, did you see his eyes, that kind of stuff. That is not what I am arguing. I am arguing that the flow that gets us to this point, that is what's tainted. That is the poisonous tree that makes the in court [sic]"). Thus, by Appellant counsel's own statements and actions at trial, he was not contesting Officer Sanchez's ability to view Appellant at the initial encounter in which he was both investigating officer and victim. Rather, Appellant's focus was that Officer Sanchez's in-court identification, even if initially founded solely on his encounter with Appellant, was tainted by his subsequent viewing of Appellant's NCIC photograph.

The Philadelphia County Court of Common Pleas granted Appellant's motion and suppressed both anticipated identifications of Appellant. The trial court, per Judge Kai N. Scott, first concluded that Officer Sanchez's warrantless search of Appellant's cell phone was unconstitutional. Moreover, the court found that the officer's testimony at the suppression hearing confirmed that the unlawful search produced the prison photograph, which enabled the police to confirm Appellant's identity, which led to Officer Sanchez

---

[4] As discussed below, generally speaking, the exclusionary rule applies to evidence that was obtained from a search or seizure in violation of the Fourth Amendment. The fruit of the poisonous tree doctrine extends the exclusionary rule to render evidence inadmissible which was derived from the initially illegally obtained evidence.

positively identifying him out-of-court. The court reasoned that Appellant would not have become a suspect but for the illegally-obtained evidence.

More specifically, the court determined that, because an arrest warrant was issued immediately after the search of the cell phone, this demonstrated that the Commonwealth relied entirely on the illegally-obtained evidence of Appellant's identity as the means to effectuate his arrest and to procure his presence for trial. The court concluded that, even if Officer Sanchez were to identify Appellant in court, such testimony was inseparable from, and dependent upon, the warrantless search. Furthermore, the court reasoned that the officer's identification could not dissipate the taint of the unlawful search of the cell phone because the "very opportunity for the officer to identify [Appellant] by his physical presence in the courtroom is occasioned upon the exploitation of the warrantless search to secure his attendance." Trial Court Opinion, 7/18/16, at 12. According to the court, there was no evidence independent of the unlawful search that could establish Appellant's identity in court, as the officer's unlawful search and out-of-court identification were what enabled the officer to identify Appellant at trial.

Related thereto, the court rejected the Commonwealth's argument that Officer Sanchez was able to identify Appellant at trial on the independent basis of his observations of Appellant during the initial traffic stop. Possibly as a result of trial counsel's position, in granting Appellant's motion, the trial court did not find Officer Sanchez's initial viewing of Appellant at the scene of the crime to be defective. N.T., 3/18/16, at 5-6 ("The Commonwealth . . . talked a lot about the suggestivity of the identification, and that is one basis for exclusion identification, but it's not the sole basis that an I.D. can be excluded. I'm not suggesting that Officer Sanchez wasn't able to see what he saw."). Instead, the court concluded that no independent basis existed for the officer's in-court identification because the officer's testimony was inseparable from and

dependent upon the warrantless search that he conducted of Appellant's cell phone. Thus, according to the court, the Commonwealth failed to establish that the officer's observations were "truly independent" of either his actions that constituted misconduct or the tainted testimonial evidence that his illegal search produced because the officer himself conducted the warrantless search, and such "unlawful search disqualifies his testimony on that matter at trial." Trial Court Opinion, 7/18/16, at 16-17. The Commonwealth appealed.[5]

In a unanimous opinion, President Judge Emeritus John T. Bender, writing for a three-judge panel of the Superior Court, affirmed in part, reversed in part, and remanded the matter for further proceedings. *Commonwealth v. Santiago*, 160 A.3d 814 (Pa. Super. 2017). As neither party disputed the suppression court's underlying ruling that the warrantless search of Appellant's cell phone was unconstitutional, the Superior Court limited its review to the scope of the suppression remedy afforded to Appellant as a result of the unconstitutional search, and an examination of the Commonwealth's contention that, because eyewitness identification testimony is never suppressible, the trial court erred in suppressing Officer Sanchez's anticipated in-court identification of Appellant.

The court first spoke to the Commonwealth's blanket assertion that neither a defendant's presence, nor a witness's independent memory of a face, is suppressible, by tracing the history of applicable federal and Pennsylvania case law beginning with the United States Supreme Court's decision in *Wong Sun v. United States*, 371 U.S. 471 (1963).[6] The court observed that, under certain circumstances, eyewitness identifications

---

[5] On April 14, 2016, the Commonwealth filed a notice of appeal indicating that the suppression court's order terminated or substantially handicapped the prosecution of Appellant, justifying an interlocutory appeal per Pa.R.A.P. 311(d).

[6] The reference to the suppression of the accused's "person," "body," or "face," at trial, stems from the United States Supreme Court's consideration of this concept in *United States v. Crews*, 445 U.S. 463 (1980), discussed below. For purposes of this decision,

have been suppressed under the fruit of the poisonous tree doctrine. *See, e.g., Gilbert v. California*, 388 U.S. 263, 272 (1967). The Superior Court reasoned that, under *Gilbert*, both in-court and out-of-court identity-related testimonial evidence is "*potentially* suppressible,*" but that identification testimony that was a direct result of unconstitutional conduct should be suppressed to deter police from engaging in such conduct. *Santiago*, 160 A.3d at 820 (emphasis original). Yet, the Superior Court noted that the *Gilbert* Court found that "the state should be afforded the opportunity to prove that the in-court identifications (based on direct observations of criminal conduct) were admissible if such testimony was 'untainted' by the unconstitutional acts, by showing an independent source for such testimony." *Id.*

Next, the Superior Court turned to *United States v. Crews*, 445 U.S. 463 (1980), wherein the high Court found a victim's in-court identification of the defendant should not have been suppressed because it was based entirely on the victim's detailed recollection of the defendant, and was neither the product of, nor tainted by, police misconduct. The court noted that the United States Supreme Court did not embrace "the theory that eyewitness identification testimony is categorically not suppressible." *Santiago*, 160 A.3d at 822. Rather, it concluded it drew a "distinction between 'identity' itself — that is, the *presence of the defendant at trial* — which is never suppressible, and eyewitness identification testimony, both of the in-court and out-of-court variety such as at issue in this case, which is *potentially* suppressible." *Id.* (emphasis original).[7]

we will refer to the idea of suppressing an accused's body or face as his or her "person" at trial. This can be contrasted with identification evidence or testimony.

[7] The Superior Court also distinguished the United States Supreme Court's decision in *INS v. Lopez-Mendoza*, 468 U.S. 1032 (1984), on which the Commonwealth relied. Addressing the high Court's statement that the "body" or "identity" of a defendant is never itself suppressible as a fruit of an unlawful arrest, the Superior Court first offered that the decision arose in the context of a deportation hearing, and not a criminal trial, which colored the high Court's view of the strength of protections against unlawful governmental

Finally, the court extensively examined this Court's decision in *Commonwealth v. Garvin*, 293 A.2d 33 (Pa. 1972). In *Garvin*, the defendant's arrest by police on suspicion of robbery and burglary was deemed illegal by this Court; however, a robbery victim's subsequent in-person identification of the defendant as the perpetrator, after he was taken into custody, and her in-court identification of the defendant, were deemed admissible. The *Garvin* Court reasoned that, although the police lacked probable cause to arrest the defendant, "[n]o law abiding society could tolerate a presumption that but for the illegal arrest the suspect would never have been required to face his accus[e]rs," and "the only effect of the illegal arrest was to hasten the inevitable confrontation and not to influence its outcome." *Id.* at 37. Concluding that, because the illegal arrest of the defendant merely allowed the victim to confront the defendant more promptly than would otherwise have been the case, and that the arrest played no part in the victim's identification of the defendant, as she did not meet the defendant again until the day of trial, the *Garvin* Court held it could not be assumed that, but for the illegal arrest, the defendant would have remained at large indefinitely, and "the illegality contributed neither to the knowledge of the witnesses nor the accuracy of their identifications." *Id.* at 38. Observing that the *Garvin* Court employed the taint/independent-source test, as did the high Court in *Gilbert*, rather than any categorical ban on the suppression of identity evidence, the Superior Court herein rejected the Commonwealth's assertion that eyewitness testimony is never suppressible under the fruit of the poisonous tree doctrine.

conduct. Moreover, the Superior Court read *Lopez-Mendoza* to stand for the proposition that the non-suppressibility of the body or identity of the defendant only related to a defendant's inability to object to his own physical presence in the courtroom, an argument that was not raised by Appellant herein. Rather, Appellant asserted that the police officer's testimony, through which the Commonwealth attempted to establish Appellant's identity as the perpetrator, was inadmissible.

Applying this decisional law, the Superior Court noted that Officer Sanchez's out-of-court identification of Appellant, *i.e.*, his identification of Appellant's photograph, was directly related to his unconstitutional search of Appellant's cell phone, and, thus, suppression of that identification was required. However, the court went on to determine that Officer Sanchez could have identified Appellant in court, based on his observations of Appellant made prior to the unconstitutional search of the cell phone. Thus, the Superior Court concluded that, because the officer's ability to identify Appellant in court "existed independently of, and arose prior to, the illegal act which otherwise corrupted his out-of-court identification," the officer's in-court identification of Appellant should not have been suppressed. *Santiago*, 160 A.3d at 829. We granted Appellant's petition for allowance of appeal to our Court.

As the parties agree, and we accept, that the Commonwealth's search of Appellant's cell phone was unconstitutional, we limit our review on appeal to the question upon which we granted *allocatur*. Specifically, we inquire whether the fruit of the poisonous tree doctrine warrants suppression of in-court identification testimony by a police officer who observed a defendant prior to an illegal search of that defendant's cell phone. *Commonwealth v. Santiago*, 179 A.3d 455 (Pa. 2018) (order).[8] As this issue implicates constitutional requirements and raises a pure question of law, our standard of review is *de novo*, and our scope of review is plenary. *Commonwealth v. Shabezz*, 166 A.3d 278, 285 (Pa. 2017).

---

[8] The dissent takes issue with our "reframing" the issue in a fashion that "differs textually from that upon which we granted review." Dissenting Opinion at 6, 11. Respectfully, when our Court grants allocatur on an issue as framed by the appellant verbatim, as is the case here, we have not hesitated to rephrase the issue in our opinion. It cannot be seriously contended that our elucidation of the legal issue before us is inaccurate or that we have failed to address the matters contained in the issue as framed by Appellant.

Appellant argues that the Superior Court erred in its suppression analysis. Specifically, according to Appellant, the Superior Court applied the "taint doctrine" to in-court identification testimony without making a case-by-case determination. Appellant's Brief at 11. Appellant further criticizes the Superior Court for solely relying on "overbroad language" in our Court's decision in *Garvin* that "[n]o law abiding society could tolerate a presumption that but for the illegal arrest the suspect would never have been required to face his accusers" and, "[t]hus, we conclude that the only effect of the illegal arrest was to hasten the inevitable confrontation and not to influence its outcome." *Id.* at 12 (quoting *Garvin*, 293 A.2d at 1277). Appellant asks that our Court disavow this language. Instead, Appellant stresses that, in *Commonwealth v. Fulton*, our Court reaffirmed the fruit of the poisonous tree doctrine and held that, when a witness is discovered through an unconstitutional search of a defendant's cell phone, the witness's statements to police and her trial testimony must be suppressed. 179 A.3d 475 (Pa. 2018). Appellant also points to the United States Supreme Court's decisions in *United States v. Wade*, 388 U.S. 218 (1967), and *Crews* which disallowed in-court identification testimony by a government witness unless the government showed by clear and convincing evidence that such identification was untainted, and that it had independent origins based upon observations and memories made at the time of the crime.

Appellant contends that it was the Commonwealth's burden, which the Superior Court ignored, to prove that the challenged in-court identification testimony had an independent basis which arose from the officer's observations and memory of the incident. Appellant stresses the officer's limited time to observe the driver-assailant who avoided eye contact and never got out of his car, and the absence of record evidence that Officer Sanchez ever gave a description of the perpetrator before being shown the illegally-derived police photograph. Further, Appellant claims that it was only through the

illegal search of the cell phone that Appellant's name was discovered through the NCIC photo identification of Appellant. Thus, Appellant asserts that there was no showing by the Commonwealth that the officer's in-court identification testimony was untainted. For these reasons, Appellant requests that we reverse the Superior Court's decision and order the suppression of Officer Sanchez's in-court identification testimony.

In response, the Commonwealth first argues that Appellant's claim before our Court — that the in-court identification should have been suppressed due to Officer Sanchez's brief opportunity to observe the driver which was tainted as a product of undue suggestion — is waived, as Appellant's counsel at the suppression hearing specifically stated that he was not making this claim. In support thereof, the Commonwealth proffers counsel's statement at trial that "[i]t's not the fruit itself that is the issue. It is not the in court identification. Again, I am not arguing that the officer didn't have enough time to look at my client, and was it dark outside, you know, did you see his eyes, that kind of stuff. That is not what I am arguing. I am arguing that the flow that gets us to this point, that is what's tainted. That is the poisonous tree that makes the in court [sic]." N.T., 2/19/16, at 39. Thus, according to the Commonwealth, Appellant renounced any argument that Officer Sanchez's opportunity to view him prior to seeing the contents of his cell phone was deficient or tainted.[9]

In any event, the Commonwealth asserts that such claim fails on the merits, as there was no evidence or finding of undue suggestion, and Officer Sanchez's observations of Appellant during the commission of the crime had a sufficiently

---

[9] As noted, the Commonwealth accepts that, in this appeal, a warrant or exigent circumstances were required for a lawful search of the cellphone, and, in this instance, the search was illegal. Commonwealth's Brief at 5.

independent basis for the officer's in-court identification.[10]   According to the Commonwealth, identification is not suppressible as the fruit of an unlawful search or arrest.  The Commonwealth, after cataloging relevant federal case law, offers that there is a debate surrounding whether in-court evidence regarding the identity of the offender, such as eyewitness testimony, is suppressible, compared to suppression of the accused's person.  The Commonwealth maintains that, under either scenario, Officer Sanchez's in-court identification of Appellant should stand.

Specifically, the Commonwealth first contends that, if evidence regarding *identity*, such as eyewitness identification testimony, is not suppressible, it follows that Officer Sanchez's in-court identification testimony regarding Appellant is clearly admissible.  The Commonwealth continues that, even if only the accused's person is not suppressible, then Officer Sanchez's in-court identification is still admissible, as Appellant will be present in court, regardless of the cell phone search, and Officer Sanchez would be free to identify Appellant as the one he observed at the traffic stop, prior to the illegal search of his cell phone.  While the Commonwealth acknowledges that suppression may still be required where an in-court identification was based upon improper actions by law enforcement, it asserts that no such allegation was made here, and the suppression court made no such finding.  Even if there has been such an improper suggestion, the Commonwealth contends a subsequent in-court identification may still be admissible if there exists an independent basis for that identification and, here, Appellant's counsel

---

[10] The Superior Court perceived the Commonwealth's argument before that court to be that in-court identifications can *never* be suppressed.  However, the Commonwealth agrees that an in-court identification may be suppressed, if the witness bases the identification on an impermissibly suggestive pretrial procedure, instead of an independent recollection of the offender.  This position, as explained below, is consistent with the law as it has evolved with respect to the exclusion of eyewitness identification testimony.  Thus, we reject any contention that in-court identifications can *never* be suppressed.

effectively conceded that the officer's view of Appellant was unimpeded, of sufficient duration, and made at close range. Further, the Commonwealth points out that Officer Sanchez never misidentified Appellant or equivocated when identifying him. Thus, according to the Commonwealth, Officer Sanchez's testimony was far more than required to establish an independent basis for the in-court identification, and any questions regarding the reliability of that identification were for the trier of fact.

By way of foundation for our analysis, we clarify a few matters before turning to the legal issue before us. Initially, for ease of nomenclature, we characterize the three observations/identifications at issue. First, there was the initial in-person encounter between Officer Sanchez and the individual driving the vehicle on the streets of Philadelphia ("initial encounter") *prior* to the illegal search of Appellant's cell phone. Additionally, there are two proffered identifications made by Officer Sanchez of Appellant *subsequent* to the illegal search. The first was when Officer Sanchez identified Appellant after being shown the NCIC photograph of Appellant ("out-of-court identification"). The second identification is the proffered identification by Officer Sanchez of Appellant at trial ("in-court identification").

Furthermore, while Appellant has perfunctorily invoked the Pennsylvania Constitution as an independent basis on which to analyze this matter, he fails to employ the proper analytical framework announced in *Commonwealth v. Edmunds*, 586 A.2d 887 (Pa. 1991), or even offer any meaningful argument as to how the protections provided by the Pennsylvania Constitution provide greater rights to our citizens than those provided for by the federal charter. Thus, we consider the issue before us solely under the United States Constitution.

The Fourth Amendment to the United States Constitution, which mandates that searches and seizures be reasonable, provides as follows:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.  While prohibiting unreasonable searches and seizures, the Fourth Amendment provides no express guidance on how to treat evidence that is obtained by conduct that violates the Amendment's protections.  Thus, we turn to an analysis of the relevant federal and Pennsylvania decisional law in this area.

Historically, the common law provided for the admission of all relevant evidence the government possessed, regardless of how it was obtained.  As late as 1904, the United States Supreme Court reaffirmed this approach.  *Adams v. New York*, 192 U.S. 585, 595 (1904) ("It may be mentioned in this place that though papers and other subjects of evidence may have been illegally taken from the possession of the party against whom they are offered, or otherwise unlawfully obtained, this is no valid objection to their admissibility if they are pertinent to the issue.").

Yet, within a decade, the Supreme Court for the first time departed from the common law rule regarding the admissibility of illegally-obtained property in criminal proceedings by adopting an exclusionary rule which required the suppression of such evidence.  *Weeks v. United States*, 232 U.S. 383 (1914) (finding federal marshal's seizure of letters without a search warrant, and use of letters at trial, constituted prejudicial error, requiring return of documents to defendant).  Subsequently, this exclusionary rule was extended beyond personal property when the high Court announced a prophylactic rule that evidence unconstitutionally seized could not be used by the prosecution for any purpose.  *Silverthorne Lumber Co. v. United States*, 251 U.S. 358 (1920).  Writing for the Court, Justice Oliver Wendell Holmes reasoned that "[t]he essence of a provision

forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all." *Id.* at 392.

Yet, eschewing an absolutist approach, Justice Holmes was quick to qualify his words, explaining that, "[o]f course this does not mean that facts thus [illegally] obtained become sacred and inaccessible. If knowledge of them is gained from an independent source they may be proved like any others, but the knowledge gained by the Government's own wrong cannot be used by it in the way proposed." *Id.* Thus, the independent source doctrine became the first recognized exception to the exclusionary rule. Other exceptions followed.

Almost 20 years following *Silverthorne Lumber*, in *Nardone v. United States*, 308 U.S. 338 (1939), Justice Felix Frankfurter, writing for the Court, reaffirmed the "independent source" doctrine of *Silverthorne Lumber*, coined the phrase "fruit of the poisonous tree," and went on to embrace the exception of attenuation: "Sophisticated argument may prove a causal connection between information obtained through illicit wire-tapping and the Government's proof. As a matter of good sense, however, such connection may have become so attenuated as to dissipate the taint." *Id.* at 341.

In broader fashion, the Court went on to set forth the burden-shifting analysis to be applied in exclusionary rule cases:

> The burden is, of course, on the accused in the first instance to prove to the trial court's satisfaction that wire-tapping was unlawfully employed. Once that is established — as was plainly done here — the trial judge must give opportunity, however closely confined, to the accused to prove that a substantial portion of the case against him was a fruit of the poisonous tree. This leaves ample opportunity to the Government to convince the trial court that its proof had an independent origin.

*Id.*

Finally, the high Court more recently endorsed a third exception to the fruit of the poisonous tree doctrine when it adopted the "inevitable discovery" rule in *Nix v. Williams*, 467 U.S. 431 (1984). Therein, the high Court held that, if "the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means . . . then the deterrence rationale has so little basis that the evidence should be received." *Id.* at 444.

The current expression of the doctrine was set forth in the Court's seminal decision of *Wong Sun*, *supra*. In *Wong Sun*, the Court extended the exclusionary rule to verbal statements that are the "fruits" of an unlawful search in violation of the Fourth Amendment. In that matter, federal narcotics agents unlawfully entered defendant's home at 6:00 a.m. and arrested him. In the course of making several statements which were inadmissible against him, the defendant told the agents the identity and location of a third party. The agents immediately went to the third party and obtained narcotics from him which were introduced at trial against the defendant. Holding that the narcotics were inadmissible "fruit," Justice William Brennan, writing for the majority of the Court, articulated the modern foundational standard, again eschewing an absolutist approach, and focusing on whether the evidence was obtained by exploitation of the illegal search, by independent means, or was purged of the taint:

> We need not hold that all evidence is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made *has been come at by the exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint*.

*Id.* at 487-88 (emphasis added).

As the standards and exceptions to the fruit of the poisonous tree doctrine have evolved over time, the policy rationale for the doctrine has evolved as well. The doctrine was initially based upon considerations of moral values, equitable restoration, and judicial integrity. *See* Richard M. Re, *The Due Process Exclusionary Rule*, 127 Harv. L. Rev. 1885, 1893-94 (2014). However, justification for a broad exclusionary rule evolved to rest on a single foundation: as a deterrent to police to refrain from infringing upon Fourth Amendment protections. *Id*. at 1894; *Davis v. United States*, 564 U.S. 229 (2011) (wherein all three opinions focused solely on deterrence considerations). Thus, the doctrine currently acts as a deterrent to unlawful law enforcement conduct by depriving police officers of any advantages they might derive from such unconstitutional behavior. A strong enough disincentive should work to eliminate the misconduct. However, there is a social cost to employment of the exclusionary rule. Application of the doctrine results in the inadmissibility of certain evidence, and the potential release of the guilty. Thus, the fruit of the poisonous tree doctrine, as an aspect of judicial "supervision" of police practices, has always necessitated a delicate balance, as exemplified by the above-discussed decisional law. The above constellation of federal and state high Court decisional law represents a compromise, determining that the necessity for deterrence does not reach so far as to immunize defendants from prosecution, or to require forever banning evidence from the courtroom. If the government can show that it obtained the challenged evidence by lawful means and from a source independent of the illegality, the twin aims of protecting an individual's Fourth Amendment rights and deterring illegal police conduct are satisfied.

Thus, *Silverthorne Lumber, Nardone*, *Nix*, and, most recently, *Wong Sun*, reflect the evolution of the fruit of the poisonous tree doctrine, exceptions thereto, its policy underpinnings, and the standard by which this exclusionary analysis is to be conducted.[11] The general rule arising from these decisions — excluding all evidence unlawfully seized — extends to the direct and indirect products of the illegality. The question of whether evidence is the "fruit" of illegal police conduct is resolved by determining whether, assuming the primary illegality has been established, the challenged evidence has been obtained by exploitation of that illegality, or instead, by means sufficiently distinguishable to be purged of the taint of the primary illegality.

In a series of decisions following *Wong Sun*, the United States Supreme Court applied the fruit of the poisonous tree doctrine in the difficult area of eyewitness identification. Indeed, the specific question of whether identification evidence acquired subsequent to illegal conduct is fruit of the poisonous tree, and, therefore, subject to the exclusionary rule, has vexed courts. Thus, a survey of the relevant federal and state cases in this area is warranted.

Over 50 years ago, in *Wade*, *supra*, the high Court considered a question similar to the matter *sub judice* involving a pretrial identification deriving from an illegal arrest and

---

[11] The protections announced in these decisions were made applicable to the states through the high Court's influential 1961 decision in *Mapp v. Ohio*, which declared that "all evidence obtained by searches and seizures in violation of the Constitution is, by that same authority, inadmissible in a state court." 367 U.S. 643, 655 (1961). Previously, the exclusionary rule had been required as a remedy only in federal courts for constitutional violations by the federal government. The primary concern of the *Mapp* Court was the protection of the fundamental right to privacy. Noting that the exclusionary rule is a constitutionally required right of the Fourth and Fifth Amendments, the Court further justified its decision to apply the exclusionary rule to the states upon the imperative of judicial integrity and the deterrence of police misconduct.

a subsequent in-court identification by the same witness. The Court considered the import of an alleged bank robber's participation in a pretrial lineup, conducted in the absence of counsel, and whether a witness's subsequent in-court identification should be excluded. The case involved two men who robbed a Texas bank, and two bank witnesses who identified the defendant in a pretrial lineup conducted in a local county courtroom. While counsel was appointed to represent the defendant, he received no notice of the lineup. After explaining the potential risk of prejudice in a pretrial lineup, Justice Brennan, again writing for the Court, determined that such lineup was a critical stage of the prosecution to which the right to counsel attached, and, thus, the defendant's participation in the lineup in the absence of counsel violated his Sixth Amendment right to a fair trial.

Turning to the proper relief, the Court denied the defendant's motion to strike the identification by a bank witness at trial, until the government was given the opportunity to establish that the in-court identification was based upon observations of the defendant apart from the tainted lineup identification. Relying upon the test articulated in *Wong Sun*, the Court questioned whether the identification derived from the illegal lineup, or by other means sufficiently distinct.[12] The Court could not determine whether the in-court identification had an origin independent of the lineup, and concluded that such an inquiry

---

[12] The Court listed several factors that courts should consider when evaluating whether an in-court identification is derived from sources independent of an uncounseled pretrial identification. These factors included: the prior opportunity to observe the alleged criminal act, the existence of any discrepancy between any pre-lineup description and defendant's actual description, any identification of another person prior to lineup, identification by picture of the defendant prior to lineup, the failure to identify the defendant on a prior occasion, and the lapse of time between the alleged act and lineup identification. *Wade*, 388 U.S. at 241.

was most properly made by the trial court. Thus, the Court vacated the conviction, pending a hearing to determine whether there was an independent source for the in-court identification.

In *Gilbert*, *supra*, a companion case rendered the same day as *Wade*, Justice Brennan more sharply clarified the parameters for admission of in-court identification evidence in light of *Wong Sun*. The high Court made a clear distinction between identification testimony that was tainted by an illegal lineup and that which had an independent source, such as an identification that preceded the illegal conduct. Specifically, in *Gilbert*, a bank cashier testifying in an armed robbery trial identified the defendant as the robber in the courtroom. Defense counsel moved to strike her testimony, asserting that her in-court identification was predicated in large part on her identification at a police lineup that violated the defendant's Sixth Amendment rights. The Court reasoned that the admission of the cashier's in-court testimony came without an initial determination that her identification of the defendant was not tainted by the illegal lineup. 388 U.S. at 272. As the record did not permit an informed judgment on whether the in-court identification had an independent source, the Court remanded the matter for a hearing to allow the State the opportunity to establish that the cashier's in-court identification had such a source.

The Court contrasted its treatment of this witness with witnesses whose testimony established the identity of the defendant solely as a result of the illegal lineup. The Court found that the testimony of these individuals was "the direct result of the illegal lineup 'come at by exploitation of (the primary) illegality.'" *Id.* at 272-73 (citing *Wong Sun*). Thus, the State was not permitted an opportunity to demonstrate that the identifications had an

independent source, reasoning that only a *per se* application of the exclusionary rule would ensure that law enforcement would respect an individual's constitutional right to counsel at a lineup. Expressing that the contours of the doctrine were based upon a balancing of considerations, the Court further opined that "in the absence of legislative regulations adequate to avoid the hazards to a fair trial which inhere in lineups as presently conducted, the desirability of deterring the constitutionally objectionable practice must prevail over the undesirability of excluding relevant evidence." *Id.* at 273.

Thereafter, in *Garvin*, *supra*, our Court was confronted with the question of whether an identification that was the result of an illegal arrest was tainted by that illegality. Specifically, the defendant robbed a beauty salon and two victims had ample opportunity to observe him, as they saw him for approximately five minutes in good lighting. After the defendant was illegally arrested, he was taken to the beauty shop where one of the victims identified him as one of the robbers. At trial, both victims made a positive in-court identification of the defendant. After confirming that the defendant's arrest was illegal, Justice Robert Nix, writing for the Court, considered whether the identifications should have been suppressed. Importantly, in his argument, the defendant did not differentiate between the in-court identification and the out-of-court identification, but contended that each was a fruit of the illegal arrest. The Court rejected the argument that the identifications should have been suppressed, offering that "[n]o law abiding society could tolerate a presumption that but for the illegal arrest the suspect would never have been required to face his accusors [sic]. Thus, we conclude that the only effect of the illegal arrest was to hasten the inevitable confrontation and not to influence its outcome." 293 A.2d at 37.

Applying *Wong Sun*, we reasoned that "the testimonial evidence did not derive from 'exploitation' of any illegality," and, thus, there was no reason to exclude the evidence. *Id*. According to the Court, the illegal arrest only hastened the confrontation with the one victim, and played no part in the identification of the defendant by the other victim, who did not meet the defendant again until trial. We went on, however, to opine that "[i]n either case it is clear that the illegality contributed neither to the knowledge of the witness nor to the accuracy of their identifications." *Id*. at 38.

Eight years later, the United States Supreme Court in *Crews, supra*, again addressed the suppression of an in-court identification of the defendant following his unlawful arrest in violation of the Fourth Amendment. At the Washington Monument, a woman was accosted in a restroom and robbed at gunpoint. Three days later, two other women were assaulted and robbed in the same restroom. The description of the assailant given by these women matched that given by the first victim. Police later observed the defendant who resembled the description of the perpetrator. After approaching and questioning him, he was allowed to leave. Later, a tour guide confirmed that the defendant looked like an individual he had seen on the day of the first robbery, and police arrested the defendant, albeit it was later determined this arrest was illegal. The defendant was photographed, and the first robbery victim was shown an array of eight photographs, including one of the defendant. This victim immediately selected the photo of the defendant as the individual who robbed her, and the two other victims made similar identifications. The trial court, recognizing the arrest was illegal, found that the victims' ability to identify the defendant in court was independent and untainted by the intervening identifications, and, thus, admissible. On appeal, the District of Columbia Court of

Appeals reasoned that, but for the defendant's unlawful arrest, the police would not have obtained the photograph that led to his subsequent identification by the first victim. Thus, the court found that this victim's in-court identification was at least partially the product of governmental misconduct, and so should have been excluded.

The Supreme Court rejected this approach. Again writing for the high Court, Justice Brennan explained that, pursuant to *Wong Sun* and its progeny, exclusionary sanctions apply to any "fruits," including "tangible, physical material actually seized in an illegal search, items observed or words overheard in the course of the unlawful activity, or confessions or statements of the accused obtained during an illegal arrest and detention." *Crews*, 445 U.S. at 470. While noting that most cases in this area deal with evidence that was acquired *after* the illegal conduct, the Court proffered that there were three elements of the first victim's in-court identification that could establish an independent source for the testimony: (1) the victim was present at trial to provide testimony as to what transpired at the time of the crime, and the identity of the defendant as the offender; (2) the victim was able to reconstruct the crime and to identify the defendant from her observations at the time of the crime; and (3) the defendant was present in the courtroom, so that the victim could compare his appearance to her memory of the offender.

Moreover, the Court found that none of these elements came by exploitation of the illegality, and compared this to the case where a witness's identity was discovered or her cooperation secured only as a result of illegal conduct by the government. Specifically, the Court reasoned that the victim's presence in the courtroom was not the product of any police misconduct. Furthermore, due to the victim's independent observations at the time

of the robbery, she was able to identify the defendant as the offender, and, thus, her identification was independent of the illegality:

> Nor did the illegal arrest infect the victim's ability to give accurate identification testimony. Based upon her observations at the time of the robbery, the victim constructed a mental image of her assailant. At trial, she retrieved this mnemonic representation, compared it to the figure of the defendant, and positively identified him as the robber. No part of this process was affected by respondent's illegal arrest. In the language of the "time-worn metaphor" of the poisonous tree, the toxin in this case was injected only after the evidentiary bud had blossomed; the fruit served at trial was not poisoned.

*Id.* at 472 (citations omitted).

The Court cautioned, however, that an identification made after an illegal arrest could impact the reliability of the in-court identification and render it inadmissible. Yet, the trial court expressly found the victim's in-court identification was a product of an "independent recollection of her initial encounter with the assailant, uninfluenced by the pretrial identifications, and this determination finds ample support in the record." *Id.* at 473. Thus, the Court was comfortable in holding that the victim's capacity to identify her assailant in court was not a result of the unlawful police conduct committed after the victim had developed that ability to identify.

Finally, addressing the third element, the Court explained that an "illegal arrest, without more, has never been viewed as a bar to subsequent prosecution, nor as a defense to a valid conviction." *Id.* at 474. Related thereto, the Court addressed the assertion that the defendant's person, akin to a photograph, should be considered evidence, and subject to the exclusionary rule as fruit of the illegal police conduct. While not deciding this issue, as the record disclosed that, prior to his illegal arrest, the police knew the defendant's identity and suspected his involvement in the criminal activity, Justice Brennan explained that the doctrine "enjoins the Government from benefiting from

evidence it has unlawfully obtained; it does not reach backward to taint information that was in official hands prior to any illegality." *Id.* at 475.

Most recently, the United States Supreme Court dealt with the evidentiary consequences of a Fourth Amendment violation in the context of a deportation hearing in *INS v. Lopez-Mendoza*, *supra*. After noting that a deportation hearing is a purely civil action whose purpose is not to punish but to determine eligibility to remain in the country, the high Court stated "the 'body' or identity of a defendant or respondent in a criminal or civil proceeding is never itself suppressible as a fruit of an unlawful arrest, even if it is conceded that an unlawful arrest, search, or interrogation occurred," analogizing it to forfeiture proceedings directed against contraband. *Id.* 468 U.S. at 1039-40. While at least suggesting that, in the criminal context, a culprit's presence is not excludable, the Court continued by rejecting a claim that evidence offered at the hearing was suppressible due to an unlawful arrest, holding broadly that the exclusionary rule does not apply in deportation hearings. *Id.* at 1050.

Finally, and related to our discussion, Professor Wayne LaFave offers the "pristine" example of the independent source exception — that is, an observation of an object (even made by police), prior to unconstitutional conduct, which he concludes is unquestionably admissible:

> But, in what is perhaps the most pristine example of the "independent source" exception discussed herein, the discovery of an object by an illegal search does not bar testimony about that object based upon an earlier, lawful viewing of it. *See, e.g., United States v. Templeman*, 965 F.2d 617 (8th Cir. 1992) (where package opened pursuant to valid warrant and then was closed up and controlled delivery made to defendant, whose home then illegally entered and contents of package seized, testimony about those contents admissible, as "they had previously been discovered as a result of the valid search"); *Cooper v. State*, 432 So.2d 161 (Fla. App. 1983) (where police illegally seized meat stolen from grocery store, manager of store could testify about

observing the taking of the meat and could testify about the value of the meat if he knew it from that observation, but could not testify as to value if it determined by examining the meat after the police recovered it); *State v. Black*, 175 W.Va. 770, 338 S.E.2d 370 (1985) (though cash boxes recovered from defendant's house in illegal search, officer could testify as to seeing those boxes in defendant's car earlier during lawful stop).

6 LaFave, *Search & Seizure*, § 11.4 at 322 n.1.

From this decisional law, scholarship, and underlying policy expressions emerge certain guiding principles regarding application of the fruit of the poisonous tree doctrine relevant to the identification testimony issues before us. First, *Wong Sun* provides the general inquiry underlying the doctrine: "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun*, 371 U.S. at 488. The general rule excludes all evidence unlawfully seized, and this extends to the direct and indirect products of the illegality. *Silverthorne Lumber*. Moreover, excludable evidence includes proof that is tangible and physical materials, items observed, words overheard, confessions or statements made by the accused, and eyewitness identification testimony. *Crews*.

Further, there is no *per se* ban on the admission of all evidence resulting from unlawful law enforcement conduct. *Silverthorne Lumber*; *Wong Sun*; *Crews*. Rather, an inquiry must be made into the source of the evidence as well as any potential tainting of the evidence due to unconstitutional actions by police. Any evidence that comes solely as a result of illegal conduct is tainted fruit, and is not admissible. *Gilbert*. Conversely, the mere fact that certain evidence was obtained illegally does not necessarily bar evidence based upon an earlier, lawful viewing. *Crews*; 6 LaFave, *Search & Seizure*, § 11.4 at 322 n.1. Evidence whose origin is wholly independent of unconstitutional action by law enforcement is admissible. *Wade*. However, even evidence that originates prior

to illegal conduct may be impacted by these unconstitutional actions, as those actions can affect the reliability of the evidence at trial or render it inadmissible. *Crews.* All these principles apply equally to identification testimony. *Wade*; *Gilbert*; *Crews.*

Based upon all of the above, we hold that an identification made wholly as a result of a warrantless search renders such identification tainted and inadmissible. However, eyewitness identification of a defendant occurring *prior* to illegal conduct by law enforcement may be admissible, if based on observations that are independent of the taint of the subsequent unconstitutional search.[13]

Turning to application of these principles to the matter *sub judice*, if Officer Sanchez's in-court identification was not independent of the illegal search of Appellant's cellphone, but, rather, was tainted by the unconstitutional conduct and the subsequent

---

[13] Our holding today is consistent with federal jurisprudence in this area. *See, e.g.*, *U.S. v. Concepion*, 983 F.2d 369, 378 (2d Cir. 1992) (in-court identification admissible where witnesses had opportunity to observe defendant, nature of events, including identification made unequivocally within minutes or hours of shooting); *Montgomery v. Greer*, 956 F.2d 677, 681-82 (7th Cir. 1992) (although post-arrest lineup identification inadmissible fruit of illegal arrest, in-court identification admissible because based on independent recollection of previous encounter and rape victim's opportunity to view assailant) *Killebrew v. Endicott*, 992 F.2d 660, 664-65 (7th Cir. 1993) (in-court identification admissible when witness had between 30 seconds and 3 minutes to observe defendant from a distance of two feet, defendant spoke to witness, witness trained to observe characteristics, and witness testified shape of defendant's face and nose stuck in her mind); *U.S. v. Foppe*, 993 F.2d 1444, 1451 (9th Cir. 1993) (although photo identification inadmissible fruit of illegal arrest, in-court identification admissible because witness previously observed defendant in well-lit bank at close range); *U.S. v. Slater*, 692 F.2d 107, 108 (10th Cir. 1982) (regardless of whether out-of-court identification from photo obtained pursuant to illegal arrest was admissible, in-court identification admissible because witness saw crime at close range, there was little discrepancy between pretrial description and actual appearance, and no misidentification or failure to identify defendant); *U.S. v. Thody*, 978 F.2d 625, 629 (10th Cir. 1992) (subsequent to impermissibly suggestive line up, in-court identification admissible when witnesses observed defendant for several minutes at a distance of a few feet, light was good, witnesses were attentive and trained to describe robber, three witnesses' description were all similar, and one witness cried "it's him" upon seeing defendant at second robbery).

observation of Appellant's picture as a result of the NCIC search, then all evidence that came as a byproduct of the illegal cell phone search, including the NCIC identification, was properly suppressed.

However, Officer Sanchez observed Appellant both as a government officer and as a victim of a crime *prior* to the illegal search.[14] Thus, Officer Sanchez's identification was potentially free from any taint caused by the illegal search. In other words, Officer Sanchez's in-court identification testimony may have been tainted by the illegal cell phone search, or may have been sufficiently independent therefrom and, thus, admissible at trial.[15] *Wade*; *Gilbert*; *Crews*; *Garvin*.[16]

After the Commonwealth placed into evidence at the suppression hearing the officer's observations of Appellant during their initial encounter, under the *Nardone* burden shifting construct, *supra*, it was incumbent upon Appellant to challenge the illegal

---

[14] We recognize that Officer Sanchez, in this instance, is in the unusual position of being the initial witness to, and actual victim of, a crime, and also the government agent who, as an investigator, then illegally searched Appellant's cell phone without a warrant, and viewed Appellant's photograph through the NCIC system, leading to Appellant's arrest. Yet, we see no reason to treat law enforcement officers any differently than any other witness to a crime, and no case law offered by the parties suggests otherwise. Either the evidence has an independent source or the evidence is tainted, regardless of whether the victim/witness identification testimony comes from a police officer or a member of the general public.

[15] Of course, even if admissible at trial, Officer Sanchez's identification testimony would be subject to cross examination and a credibility determination by the finder of fact.

[16] Appellant urges that Officer Sanchez's identification testimony should be suppressed in its entirety, consistent with our recent decision in *Fulton*, *supra*. We reject this argument. Specifically, while *Fulton*, like this matter, involved the illegal search of a cell phone, all the evidence suppressed in that case was obtained as a result of the illegal search, including the existence of a witness whose testimony identified the defendant as using a name that was linked to the name of the murderer. *Fulton*, 179 A.3d at 495. Consistent with *Fulton*, and as noted above, we find that any evidence obtained wholly as a result of the unconstitutional search of Appellant's cell phone must be suppressed. Unlike *Fulton*, however, here we have Officer Sanchez's observations that occurred prior to the unlawful search of the cell phone, which if independent of that taint, would not constitute fruit of the poisonous tree, and, as a result, would be admissible at trial.

search (which he did), but also the factual nexus, or relationship, between that primary illegality and the evidence in issue, *i.e.*, that the specific identification evidence against him was, indeed, an identifiable fruit of the poisonous tree. That is, Appellant needed to establish that the initial encounter observations were tainted (or challenge the veracity of the officer's observations as an independent means of identification that he was not, in fact, able to identify Appellant as the perpetrator at that time). In response, the Commonwealth would have then had the opportunity to convince the court that the identification testimony was independent of any taint of the illegal search. *Nardone*, 308 U.S. at 341.

Yet, here, as we view counsel's ambiguous objection at the suppression hearing, Appellant advocated only that Officer Sanchez's testimony was retroactively tainted by the "flow" — the post-encounter unconstitutional search. N.T., 2/19/16, at 39 ("It's not the fruit itself that is the issue. It is not the in court identification. Again, I am not arguing that the officer didn't have enough time to look at my client, and was it dark outside, you know, did you see his eyes, that kind of stuff. That is not what I am arguing. I am arguing that the flow that gets us to this point, that is what's tainted. That is the poisonous tree that makes the in court [sic]"). At the suppression hearing, Appellant did not contest whether Officer Sanchez has a sufficient opportunity to view Appellant, whether the lighting was sufficient, or the officer's ability to examine Appellant's face. *Id.* Rather, Appellant's focus throughout this litigation has been that Officer Sanchez's in-court identification, even if initially founded solely on his encounter with Appellant, was tainted by his post-encounter observation of Appellant's photograph in the NCIC database. Therefore, Appellant failed to establish how the illegally searched cell phone tainted Officer Sanchez's initial

observations of Appellant, or to challenge the veracity of the officer's identification. As a result, we find Appellant did not meet his burden.[17]

---

[17] The dissent criticizes the majority for failing to properly construe Appellant's arguments. Dissenting Opinion at 8-11. However, we must resolve the legal issues before us in the context of the advocacy preserved and presented — both before the lower tribunals and our Court — and we find Appellant's arguments ambiguous at best. Appellant's arguments, both at the suppression hearing and before us, in our view, do not comprise the legal arguments now analyzed by the dissent, which include the inherent unreliability of eyewitness identification, a *Crews*-based argument regarding a lack of capacity to identify, and the sufficiency of Officer Sanchez's initial recollection of events. To read these arguments into Appellant's brief borders on the clairvoyant.

More importantly, and simply stated, it was Appellant's burden to establish the relationship between the illegal search and the objected-to evidence — that is, set forth some argument explaining how Officer Sanchez's in-court identification testimony was tainted. *Nardone*, *supra*; *Alderman v. United States*, 394 U.S. 165, 183 (1969) (same). In our view, Appellant's single conclusory statement that "both the in[-]court and out[-]of court identification came directly from that warrantless search and the in[-]court identification would be considered fruits of the poisonous tree[,]" N.T., 2/19/2016, at 5, does not satisfy this explanatory burden. While the dissent eschews the half-century old standard set forth in *Nardone*, our Court has at least implicitly adopted the largely uncontroversial standard set forth therein. *Commonwealth v. Sartin*, 751 A.2d 1140, 1146 (Pa. 2000) (quoting *Alderman* for proposition that "when a defendant claims that the government has sought to introduce the fruits of a coerced confession, the defendant must go forward with specific evidence demonstrating taint, upon which the government 'has the ultimate burden of persuasion to show that its evidence is untainted.'"); *see also Commonwealth v. Murray*, 223 A.2d 102, 105-06 (Pa. 1966) ("The Court said in the *Nardone* case that once it is shown that there has been an unlawful wire tapping, as was shown here, the accused has to be allowed the opportunity 'to prove that a substantial portion of the case against him was a fruit of the poisonous tree.' That is all the *Nardone* case established and, in fact, the Supreme Court reversed the conviction and sent the case back for retrial because *Nardone* had not been given the opportunity to show how much of the prosecution evidence was tainted."). The generic cases cited by the dissent simply do not implicate a burden question.

Finally, contrary to the dissent's charge, Dissenting Opinion at 8 n.5, our characterization of Appellant's arguments is consistent throughout — Appellant does not directly challenge Officer Sanchez's observations of him at the initial encounter, but, rather, asserts that the subsequent in-court identification based upon the initial encounter was, in unspecified fashion, tainted by the illegal search of Appellant's cell phone and the out-of-court identification. *See* Majority Opinion at 4, 10, 29-30, 32.

Related thereto, and perhaps due to Appellant's failure to challenge Officer Sanchez's initial observations, the trial court engaged in no analysis of whether the officer's identification testimony was insufficiently founded on his initial encounter with Appellant. Rather, the court seemingly also labored under the misunderstanding that, because of the subsequent illegal search, the officer's prior observations had to have been *ipso facto* tainted. Trial Court Opinion, 7/18/16 at 16 ("Even if Officer Sanchez were to identify [Appellant] at trial based on his observations of [Appellant] made during the vehicle stop, no independent basis exists for his in-court identification because his testimony is inseparable from and dependent upon the warrantless search that he himself conducted of [Appellant's] cell phone."). However, any such retroactive application of the fruit of the poisonous tree doctrine has long been dispelled by the United States Supreme Court. *See Maryland v. Macon*, 472 U.S. 463, 471 (1985) ("The exclusionary rule enjoins the Government from benefitting from evidence it has unlawfully obtained; it does not reach backward to taint information that was in official hands prior to any illegality." (quoting *Crews*, 445 U.S. at 475 (internal quotation marks omitted)). Thus, we reject any suggestion that the fruit doctrine operates retroactively.

Furthermore, as a distinct analysis, the trial court suggested that the illegal cell phone search led to Appellant's presence at trial, offering that the "very opportunity for the officer to identify [Appellant] by his physical presence in the courtroom is occasioned upon the exploitation of the warrantless search to secure his attendance." Trial Court Opinion, 7/18/16, at 12. In its view, it was solely Officer Sanchez's unlawful search and out-of-court identification that made it possible for the officer to identify Appellant at trial. Before us, Appellant makes a similar argument, asking us to overrule *Garvin* to the extent it stands for the proposition that one cannot suppress the accused's person as fruit of the poisonous tree. We reject the trial court's analysis and Appellant's request. We interpret

*Garvin*, which made no distinction between in-court and out-of-court identification, to stand for the unremarkable proposition that the defendant — that is, his or her compelled presence at trial — is not subject to suppression. *Garvin*, 293 A.2d at 37 ("No law abiding society could tolerate a presumption that but for the illegal arrest the suspect would never have been required to face his accusors [sic]. Thus, we conclude that the only effect of the illegal arrest was to hasten the inevitable confrontation and not to influence its outcome."); *Crews*, 445 U.S. at 474 ("[The Appellant] is not himself a suppressible 'fruit,' and the illegality of his detention cannot deprive the Government of the opportunity to prove his guilt through the introduction of evidence wholly untainted by the police misconduct.");[18] *see also Commonwealth v. Carter*, 643 A.2d 61, 68 (Pa. 1994) ("an illegal arrest is not a bar to a subsequent prosecution nor a defense to a valid conviction."). Indeed, in *Garvin*, our Court found that identification evidence was not the product of an unlawful arrest because the arrest did not contribute to the witness's knowledge or the accuracy of the identification. *Garvin*, 293 A.2d at 38. It was in this context that the Court offered that the only effect of the illegal arrest was to hasten the inevitable confrontation between witness and defendant, and that it could not be assumed that, but for the illegal

---

[18] Although three members of the Court in *Crews* asserted that it was unnecessary to "decide whether respondent's person [*i.e.,* his face] should be considered evidence, and therefore a possible 'fruit' of police misconduct," because "the record plainly discloses that prior to his illegal arrest, the police both knew respondent's identity and had some basis to suspect his involvement in the very crimes with which he was charged," *Crews*, 445 U.S. at 474-75, a majority of the Court disagreed. Two members of the Court stated they "would reject explicitly … the claim that a defendant's face can be a suppressible fruit of an illegal arrest," *id.* at 477 (Powell, J., concurring), while three others made essentially the same assertion and concluded "that a majority of the Court agrees that the rationale of *Frisbie* [*v. Collins* 342 U.S. 519 (1952)] forecloses the claim that respondent's face can be suppressible as a fruit of the unlawful arrest," *id.* at 479 (White, J. concurring). Thus, a majority of the *Crews* Court found that a defendant's presence (and thus including the defendant's face for identification purposes) is not evidence subject to the fruit of the poisonous tree doctrine. *Cf. Lopez-Mendoza*, 468 U.S. 1032, 1039-40 (1984).

arrest, the defendant would have remained at large indefinitely. *Id.* Thus, the alleged culprit, and his presence for purposes of identification, even if arrested as the result of an illegal search, is not suppressible.[19]

In conclusion, we agree with both the trial court and the Superior Court that Officer Sanchez's out-of-court identification was suppressible. As Officer Sanchez could have identified Appellant in court based solely upon his observations of Appellant made during the traffic stop, and because Appellant did not challenge this original observation testimony as being infected by the taint of the unconstitutional search of Appellant's cell phone, the trial court erred in suppressing Officer Sanchez's in-court identification as fruit of the poisonous tree, as the Superior Court found. Accordingly, we affirm the order of the Superior Court.

Jurisdiction relinquished.

Chief Justice Saylor and Justices Baer, Dougherty and Mundy join the opinion.

Justice Wecht files a dissenting opinion in which Justice Donohue joins.

---

[19] While the dissent contends that our discussion lacks "any rigorous analysis" regarding Appellant's invitation to revisit *Garvin*, Dissenting Opinion at 11, as the above discussion makes plain, we have addressed that decision and its meaning in the context in which it arose. Majority Opinion at 30-31. Furthermore, the dissent's differing interpretation of *Garvin*, and its conclusion that *Garvin* calls for the nullification of the exclusionary rule and is contrary to *Wong Sun*, Dissenting Opinion at 12, fails to account for the teachings of *Crews* and *Carter*, also discussed above, both of which post-date *Wong Sun* and stand for the same proposition offered in *Garvin* — that an illegal arrest does not bar a subsequent prosecution or deprive the government the opportunity to establish guilt through untainted evidence. Obviously, we do indeed decline Appellant's invitation to "explicitly disavow" the *Garvin* decision. Appellant's Brief at 12-13.