J. S62042/19

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| v. | : | No. 939 WDA 2019 |
| | : | |
| TREY BARNES | : | |

Appeal from the Order Entered June 4, 2019,
69in the Court of Common Pleas of Beaver County
Criminal Division at No. CP-04-CR-0002459-2018

BEFORE:  PANELLA, P.J., KUNSELMAN, J., AND FORD ELLIOTT, P.J.E.

MEMORANDUM BY FORD ELLIOTT, P.J.E.:          **FILED JANUARY 6, 2020**

The Commonwealth appeals from the June 4, 2019 order entered in the Court of Common Pleas of Beaver County that granted the omnibus pretrial motion filed by appellee, Trey Barnes, that consisted of a petition for writ of **habeas corpus** and a motion to suppress physical evidence.  We affirm.

The suppression court set forth the following findings of fact:

1.    On November 26, 2018, Beaver Falls Police Department was dispatched to the area of 1504 Sixth Avenue for an incident involving two black males dressed in all black grabbing a light-skinned female and dragging her into a residence.

2.    Officer Higby, Officer Moreno, and Captain Kryder of the Beaver Falls Police Department all responded to the call.

3.    Upon arrival to the scene officers observed a car with its lights on directly in front of the

residence. This vehicle was attempting to back out of the parking spot.

4. The officers' [sic] pulled their patrol car right up next to the car to prohibit it from fleeing the area.

5. Officer Higby approached the front passenger's side of the vehicle and observed two black males in the back wearing all black and a light-skinned female between them. The two males were reaching towards their sides during the encounter.

6. The Officers advised the males multiple times to keep their hands visible; however, they did not comply and were asked to exit the vehicle for officer safety.

7. [Appellee] was patted down by Officer Higby after he exited the vehicle to check for any weapons.

8. Officer Higby overheard Officer Moreno advise the other individual that he saw a baggy sticking out of his pocket.

9. Officer Moreno recovered the bagg[y] from the other involved individual which contained a large amount of heroin and placed the other individual in the back seat of the patrol car.

10. Contemporaneously to Officer Moreno detaining the other individual, Officer Higby attempted to ascertain the identity of [appellee] by asking [appellee] his name.

11. Initially, [appellee] identified himself as "James Barnes" from New Castle.

12. Officer Higby told [appellee] "if you're who you say you are, we'll get this all worked out, but before I start running your information, don't,

you know, drag me along if you're giving me your correct information."

13. County Dispatch advised Officer Higby that they could not locate a record for a "James Barnes" out of New Castle with the date of birth provided.

14. Officer Higby continued to question [appellee] regarding his identity and [appellee] advised Officer Higby that he was from Indiana and did not have a middle name, which turned out to be incorrect information.

15. Officer Higby detained [appellee] for providing false information and patted him down for a second time and checked his pockets before placing him into the patrol car. When Officer Higby checked [appellee's] pockets, he recovered [appellee's] wallet, which identified [appellee] as Trey James Barnes out of Pontiac, Michigan.

16. Officer Higby then placed [appellee] under arrest for false ID to law enforcement and conducted a further search of [appellee's] person, which resulted in the recovery of a large baggy containing multiple individual baggies of suspected crack cocaine and approximately $1,200.00 in U.S. Currency.

17. After [appellee] was handcuffed and arrest[ed] for False Identification, he attempted to run.

18. Officer Higby retrieved a backpack from the vehicle and searched it outside the vehicle before placing it into the patrol car. The backpack contained a scale, box of Ziploc baggies, and two and a half (2½) to three (3) boxes of sleeping pills. [Appellee] and the other male passenger were both charged as a result of the search of the backpack.

> 19. [Appellee] was searched a third time at the police station and officers recovered a bag with "lottery folds" containing suspected heroin.

Suppression court opinion, 8/12/19 at 5-10 (record citations omitted; ellipses in original).

The record reflects that appellee was charged with manufacture or possession with intent to manufacture (heroin and crack cocaine), possession of a controlled substance (heroin and crack cocaine), possession of drug paraphernalia, resisting arrest, kidnapping, robbery, unlawful restraint, and false identification.[1] Following a preliminary hearing, the resisting arrest, kidnapping, and unlawful restraint charges were dismissed. Thereafter, appellee filed an omnibus pretrial motion, followed by an amendment thereto. The amended omnibus pretrial motion included a petition for writ of **habeas corpus** for the false identification[2] charge and a motion to suppress physical evidence. The suppression court held a hearing on the motion on June 4, 2019. Officer Higby was the only witness to testify. The Commonwealth and appellee agreed to incorporate the transcript of appellee's preliminary hearing into the suppression hearing record. (Notes of testimony, 6/4/19 at 5, 45-46.) At the conclusion of the hearing, the suppression court

---

[1] 35 P.S. §§ 780-113(a)(30), (a)(16), and (a)(32); 18 Pa.C.S.A. §§ 5104, 2901(a)(3), 3701(a)(5), 2902(1), and 4914(a), respectively.

[2] We note that the amended omnibus pretrial motion also included a petition for writ of **habeas corpus** for resisting arrest. The Commonwealth, however, has conceded that "the resistance in this case does not rise to the level required by the resisting arrest statute." (Commonwealth's brief at 4 n.1.)

granted appellee's omnibus pretrial motion because the search was incident to an unlawful arrest for false identification. (Notes of testimony, 6/4/19 at 61.)

Following entry of the order granting appellee's omnibus pretrial motion, the Commonwealth filed a timely notice of appeal. Within its notice of appeal, the Commonwealth certified that the suppression court's order would terminate or substantially handicap appellee's prosecution. *See* Pa.R.A.P. 311(d) (permitting Commonwealth appeal from an interlocutory order if it certifies that the order will terminate or substantially handicap the prosecution). Thereafter, the suppression court ordered the Commonwealth to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). The Commonwealth timely complied. The suppression court then filed its Rule 1925(a) opinion.

The Commonwealth raises the following issues for our review:

1. Did the [suppression] court err in dismissing the charge of false identification to law enforcement, where the officer informed [a]ppellee of the existence of an investigation into a kidnapping and [a]ppellee's suspected involvement in drug activity?

2. Did the [suppression] court err in suppressing the items seized from the motor vehicle after responding officers saw [a]ppellee's co-defendant with drugs and drug paraphernalia on his person?

3. Did the [suppression] court err in suppressing the items seized from [a]ppellee's person subsequent to [a]ppellee's arrest?

Commonwealth's brief at 4-5.

> When the Commonwealth appeals from a suppression order, we follow a clearly defined standard of review and consider only the evidence from the defendant's witnesses together with the evidence of the prosecution that, when read in the context of the entire record, remains uncontradicted. The suppression court's findings of fact bind an appellate court if the record supports those findings. The suppression court's conclusions of law, however, are not binding on an appellate court, whose duty is to determine if the suppression court properly applied the law to the facts.
>
> Our standard of review is restricted to establishing whether the record supports the suppression court's factual findings; however, we maintain ***de novo*** review over the suppression court's legal conclusions.

***Commonwealth v. Korn***, 139 A.3d 249, 252-253 (Pa.Super. 2016) (internal citations and quotation marks omitted).

Here, the suppression court found that the evidence failed to demonstrate that Officer Higby informed appellee that he was under official investigation in violation of ***Commonwealth v. Kitchen***, 181 A.3d 337 (Pa.Super. 2018) (***en banc***), which necessitated ***habeas*** relief on the false identification charge. Additionally, because appellee's arrest for false identification was illegal, the suppression court determined that all evidence obtained in the subsequent searches was "fruit of the poisonous tree" and must be suppressed. With certain exceptions not applicable here, "[t]he 'fruit of the poisonous tree' doctrine prohibits the admission of evidence at trial that was tainted by unconstitutional actions by law enforcement officials."

*Commonwealth v. Santiago*, 209 A.3d 912, 914 (Pa. 2019). Pennsylvania's decisional law has long held that "evidence seized as a result of an unlawful arrest must be excluded." *Commonwealth v. Johnson*, 83 A.3d 182, 187 (Pa. 2014).

A person commits the offense of false identification "if he furnishes law enforcement authorities with false information about his identity after being informed by a law enforcement officer who is in uniform or who has identified himself as a law enforcement officer that the person is the subject of an official investigation of a violation of law." 18 Pa.C.S.A. § 4914(a). Our supreme court set forth the elements necessary for a conviction of false identification to law enforcement authorities as follows: (1) if not in uniform, the law enforcement officer must identify himself as such; (2) the officer must inform the individual that he is the subject of an official investigation of a violation of the law; and (3) the individual must give false information after being so informed. *In re D.S.*, 39 A.3d 968, 974 (Pa. 2012). In *Kitchen*, this court held that the accused is not required to infer from the attendant circumstances that he is the subject of an investigation, but that the officer must inform the accused that he is the subject of an official investigation prior to the accused's giving false identification. *Kitchen*, 181 A.3d at 342-343. This court restated that "'the official investigation element of 18 Pa.C.S.[A.] § 4914(a) cannot be satisfied solely by an investigation of the individual's providing false

information as to his identity.'" ***Id.*** at 343 (original brackets omitted), quoting

***Commonwealth v. Barnes***, 14 A.3d 128, 131 (Pa.Super. 2011).

Here, the record reflects that Officer Higby testified at the preliminary

hearing on direct examination as follows:

> Q. All right. And did you detain somebody as well?
>
> A. Yes, I was speaking to [appellee], and I asked him what his name was, and he told me his name was James Barnes and provided me a date of birth and told me he was out of New Castle.
>
> . . . .
>
> Q. Did you run his information?
>
> A. Before I even ran his information, I told him straight up, if you're who you say you are, we'll get this all worked out, but before I start running your information, don't, you know, drag me along if you're giving me your correct information, and he continued to say that his name was James Barnes, so I did run his information at that time.
>
> Q. Okay. And when you ran his information, anything come back.
>
> A. No, County Dispatch advised that they could find no record.
>
> Q. All right. What happens then?
>
> A. I continued to question [appellee] and asked him where he was from, and at that point he, I believe he told me he was from Indiana.
>
> Q. Okay. When getting this information, did you follow up on that at all?

> A. I did. I asked him, I said, I asked him, what his middle name was, if he had a middle name, and he said, I don't. It's just James Barnes, so at that time I detained him believing that he was providing me false information.
>
> Q. When you detained him, what do you mean by that?
>
> A. I placed him in handcuffs.
>
> Q. All right. And was that on suspicion of giving a false --
>
> A. Right.
>
> Q. -- false ID?
>
> A. Until I could confirm his identity.
>
> Q. And upon placing him under arrest, was he searched?
>
> A. Yes[.]

Notes of testimony, 12/18/18 at 11-13.

At the suppression hearing, Officer Higby stated on direct examination that he "can't remember if [he] officially said, 'This is an investigation.'" (Notes of testimony, 6/4/19 at 16.) When asked on cross-examination if he said anything about any kind of investigation when he initially confronted appellee, Officer Higby stated that "[c]onversation was very limited." (*Id.* at 30-31.) When asked whether the officer informed appellee that he was under investigation after appellee's cohort had been placed under arrest, Officer Higby stated, "I don't know" and then added that "[a]ny reasonable

person would, would believe that they're under, they're not free to leave."

(***Id.*** at 33-34.)  The following then took place:

> Q.    So at that point, you had not indicated to [appellee], however, expressly, which means in words, "We're investigating you as the official, as the subject of an official investigation.  Please provide me with identification"?   Did you say anything like that?
>
> A.    Prior to that, no[.]
>
> . . . .
>
> Q.    At that point when [appellee] was out of the car and away from the female, did you then tell him that he is the subject of an official investigation regarding kidnapping or drugs or anything like that?
>
> A.    I don't recall the exact words "You're under official investigation," but I told him, yeah, "Your buddy got drugs.  There's stuff in this car. We don't know what's going on. We're getting called down here for somebody getting drug [sic] into a house --
>
> Q.    You said that?
>
> A.    -- "Nobody's, nobody's going anywhere until we find out who you are."
>
> Q.    You said that to him, "We're checking out everything because your buddy got, you know, has drugs on him and we got a call about this, an abduction or a kidnapping," whatever?  You said that to him?
>
> A.    Something of that nature.  I can't say exactly the words that were said, but I know he was made aware that you're not free to go.  We're conducting an investigation.

. . . .

> Q. Did you indicate to [appellee] that if he did not provide you with correct information that he would be placed under arrest for false identification?

> A. I did.

*Id.* at 34-36, 38. Officer Higby then confirmed that he placed appellee in handcuffs to detain him for false identification, confirmed appellee's identity by looking at identification contained in appellee's wallet, arrested appellee for false identification, and then searched appellee. (*Id.* at 39-41.)

The record supports the suppression court's factual finding that Officer Higby failed to inform appellee that he was under official investigation prior to appellee's giving false identification. The suppression court properly applied *Kitchen* to conclude that appellee was entitled to *habeas* relief on the false identification charge because the Commonwealth failed to bear its burden of proving the second element of false identification that required Officer Higby to inform appellee that he was under official investigation prior to appellee's providing false identification. The suppression court also properly concluded that because appellee's arrest for false identification was unlawful, the evidence seized as a result of that unlawful arrest must be excluded as "fruit of the poisonous tree."

Order affirmed.

J. S62042/19

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/6/2020